**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| SHAREN SMITH, on behalf of herself and all others similarly situated, | : : : | |
| Plaintiffs, | : : | |
| v. | : : : | |
| | : | PLAINTIFF'S CLASS |
| CATAMARAN HEALTH SOLUTIONS, LLC, f/k/a CATALYST HEALTH SOLUTIONS, INC., f/k/a HEALTHEXTRAS, INC., and STONEBRIDGE LIFE INSURANCE COMPANY, | : : : : : | ACTION COMPLAINT |
| Defendants. | : : : | |

Now comes the Plaintiff, Sharen Smith, on behalf of herself and all other similarly situation residents of the State of South Carolina and alleges as follows:

1.     Plaintiff is a resident of Lexington County, South Carolina, who purchased a Blanket Accident Disability Insurance Policy, which was advertised under the name HealthExtras that purportedly provided them with a One Million Dollar ($1,000,000.00) lump sum Accident Permanent and Total Disability Benefit in the event the named insured became permanently disabled as a result of an accident, and an Emergency Accident and Sickness Medical Expense Benefit that purported to cover up to Two Thousand Five Hundred ($2,500.00) in medical expenses in the event of accident or sickness while away from home ("HealthExtras Benefit Program") ("HealthExtras Scheme"). Plaintiff purchased the same HealthExtras Benefit Program under the same HealthExtras Scheme as the Plaintiffs in the pending matter before this Court: *Williams v. HealthExras*, *Inc., et al.,* No. 6:14-cv-00870-BHH (2014), with the only

1

exception, the One Million Dollar ($1,000,000.00) lump sum Accident Permanent and Total Disability Benefit is underwritten by Stonebridge Life Insurance Company, (hereinafter "Stonebridge") rather than National Union Fire Insurance of Pittsburgh, PA (hereinafter "National Union"). National Union is the defendant underwriter in *Williams* and Stonebridge is the defendant underwriter in the present case.

2.      Catamaran Health Solutions, LLC (hereinafter "Catamaran") is a limited liability company organized and existing under the laws of the State of Delaware and has done business at all relevant times in the State of South Carolina. Upon information and belief, Catamaran has never been licensed or authorized by the South Carolina Secretary of State to conduct business in South Carolina nor by the South Carolina Department of Insurance to conduct insurance transactions in South Carolina, including the marketing and sale of insurance products in South Carolina.

3.      Catalyst Health Solutions, Inc. (hereinafter "Catalyst") was a corporation organized and existing under the laws of the State of Delaware and has done business at all relevant times in the State of South Carolina. Upon information and belief, Catalyst was never licensed or authorized by the South Carolina Secretary of State to conduct business in South Carolina nor by the South Carolina Department of Insurance to conduct insurance transactions in South Carolina, including the marketing and sale of insurance products in South Carolina.

4.      Defendant HealthExtras, Inc., (hereinafter "HealthExtras Inc.")  was formed in 1997 under the laws of the State of Delaware and has done business at all relevant times in the State of South Carolina. Upon information and belief, HealthExtras, Inc. was never licensed or authorized by the South Carolina Secretary of State to conduct business in South Carolina nor by

the South Carolina Department of Insurance to conduct insurance transactions in South Carolina, including the marketing and sale of insurance products in South Carolina.

5.      Upon information and belief, HealthExtras Inc., operated by its CEO, David T. Blair was incorporated in 1997 and changed its name to Catalyst Health Solutions, Inc. in 2008. Catalyst Health Solutions, Inc. was purchased by SXC Health Solutions in July 2012. Those companies merged together to form Catamaran Health Solutions, LLC in July 2012. HealthExtras, Inc. has asserted that on October 1, 2008, it changed its name to Catalyst Health Solutions, Inc., and therefore, it no longer exists. However,  HealthExtras, Inc. and its successor corporations Catalyst Health Solutions, Inc., and Catamaran Health Solutions, LLC continued to operate under the name of "HealthExtras" to conduct business, service and administer the insurance policies that are the subject of this lawsuit until at least August 1, 2012. Contrary to the assertion that HealthExtras Inc., changed its name, it, along with Catalyst and Catamaran continued to operate under the name "HealthExtras" by communicating in writing with insureds around the country via the United States mail and via electronic mail using the name "HealthExtras" on correspondence. *See* **Exhibit A**, November 14 2014 letter to Alice Lacks, Plaintiff in the matter of *Gonzalez, et al., v. HealthExtras, Inc., et al.,* 1:15-cv-2259-PGG (S.D.N.Y.)  *See* **Exhibit B**, October 15, 2013 letter to Ralph Williams, Plaintiff in the matter of *Williams v. HealthExtras, Inc., et al.,* No. 6:14-cv-870-BHH (D.S.C.). Further confusing matters, Catamaran has represented and referred to itself as the "HealthExtras Defendants" in other litigation. *See* **Exhibit C**, pg. 2. For clarity, Plaintiffs will refer to these entities "Catamaran" in this Complaint.

6.      Defendant Stonebridge Life Insurance Company ("Stonebridge") is a corporation organized and existing under the laws of Vermont. At all relevant times, Defendant Stonebridge

has done business in the State of South Carolina. Stonebridge's administrative offices are located at 2700 West Plano Parkway, Plano, Texas 75075-8200. Defendant Stonebridge may be served with process by serving its registered agent for service of process in the State of Texas, CT Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201. Stonebridge is a subsidiary of Transamerica Life & Protection. Upon information and belief, Defendant Stonebridge, at all times relevant to this action, was licensed as an insurance company and/or underwriter in the State of South Carolina and the United States of America.

### Jurisdiction, Venue and Choice of Law

7.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because there are 100 or more Class Members and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs. Additionally, at least one Class member is a citizen of a state different from the corporate domiciles of the Defendants.

8.      This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

- The class, which includes an unknown number of persons but certainly more than 100, is so numerous that joinder of all members is impractical;

- There are substantial questions of law and fact common to the class including those set forth in greater particularity in Paragraph 30 herein; and

- This case is properly maintainable as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

    (a)     questions of law and fact enumerated below, which are all common of the class, predominate over any questions of law or fact affecting only individual members of the class;

4

(b)     a class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

(c)     the relief sought in this class action will effectively and efficiently provide relief to all members of the class; and

(d)     there are no unusual difficulties foreseen in the management of this class action.

9.     Defendants, collectively and individually, at all relevant times conducted substantial business in this district, many of the violations occurred in this district, and many of the acts and transactions alleged in this Complaint occurred in this district.

10.     The Court has personal jurisdiction over all Defendants, who have at least minimum contacts with the State of South Carolina because Defendants conduct business here and have availed themselves of South Carolina's markets through its promotion, sales and marketing efforts as well as Defendants' issuance of insurance policies and collection of premiums within South Carolina to and from residents of South Carolina.

11.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.     South Carolina's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amendment, §1, and the Full Faith and Credit Clause, Article IV, §1, of the U.S. Constitution. South Carolina has a significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs, thereby creating state interests that ensure that the choice of South Carolina state law is not arbitrary or unfair.

13.     Defendants' actions and omissions of which Plaintiff complains were directly targeted at residents of South Carolina and are in derogation of the State of South Carolina's interest in the regulation of insurance sold within the state. South Carolina has an interest in

regulating Defendants' conduct in marketing and selling insurance products within its borders to its residents.

14.     South Carolina residents were the target of Defendants' marketing and sale of insurance and Defendants' alleged misconduct injured and affected Plaintiff and the Class Members residing in South Carolina.

15.     Accordingly, the application of South Carolina's laws to Plaintiff and the proposed Class Members is appropriate under South Carolina's choice of law rules because South Carolina has significant contacts to the claims of Plaintiff and all members of the proposed Class, and South Carolina has a greater interest in applying its laws here than any other state.

16.     Venue in the United States District Court for the District of South Carolina is proper because Defendants transact business within this District and a substantial part of the events giving rise to the claims at issue in this Complaint occurred in this District.

17.     South Carolina's substantive laws apply to the proposed Class, as defined herein, because Plaintiff properly brings this Complaint in this District alleging violations of South Carolina law as well as federal statutory claims.

**Preliminary Allegations**

18.     This matter is governed by the law of the State of South Carolina and the United States of America. This matter is not governed by ERISA 29 U.S.C. § 1001, et seq.

19.     This action arises from the wrongful conduct of Catamaran, Virginia Surety and Stonebridge toward the Plaintiff and others similarly situated in the State of South Carolina, including but limited to the following:

a.  the illegal selling and underwriting of blanket group insurance to consumers who were not members of any lawful, blanket group for which the sale of such an insurance product could be authorized;

b.  the false and deceptive advertising, solicitation, sale, and post-sale marketing of disability insurance that is illegal under South Carolina law;

c.  the creation of fictitious groups in which to place this insurance for the purpose of avoiding state insurance regulations and laws;

d.  the calculation and collection of excessive premiums or fees charged for this illegal insurance product;

e.  conspiracy among the defendants to create a sham organization operating under the name HealthExtras for the purpose of avoiding the State of South Carolina's insurance regulations and laws;

f.  conspiracy among the defendants to create a sham organization operating under the name HealthExtras for the purpose of charging excessive illegal premiums for a virtually worthless disability insurance product;

g.  conspiracy among the defendants to create a sham organization operating under the name HealthExtras for the purpose of concealing from the public and the State of South Carolina the true nature of the sham organization known as HealthExtras;

h.  unjust enrichment;

i.  breach of duty of good faith and fair dealing;

j.  violations of the South Carolina Unfair Trade Practices Act;

      k.   violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; and

      l.   other misconduct.

20.    Catamaran and Stonebridge, have engaged in activities that violate the statutory and common law of the State of South Carolina and have transacted business within the State of South Carolina.

21.    Catamaran and Stonebridge are jointly and severally liable for the wrongful conduct alleged herein.

22.    This case seeks recovery of disgorgement and return of all illegal premiums, treble and punitive damages, interest, as well as injunctive and other equitable relief, attorneys' fees and costs, including costs of investigation reasonably incurred, and other damages.

23.    Catamaran and Stonebridge have acted in conspiracy and in concert with each other in connection with the claims alleged herein.

24.    Plaintiff and the Class Members have sustained damages that include, but are not limited to, conversion of their personal property in the form of debits of illegal insurance premiums by the Defendants for a group disability policy that is illegal.

<u>**Class Allegations**</u>

25.    Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a Class of individual residents of the State of South Carolina who owned, purchased or paid premiums for disability insurance coverage with Defendants for disability insurance product known as HealthExtras from 2000 through the date of class certification.

26.    Plaintiff brings this action as a class representative to recover damages and/or refunds from these Defendants for violations of S.C. Code Ann. § 39-5-10 *et seq*., unjust

enrichment, civil conspiracy, Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, punitive damages, and injunctive relief.

27.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a)(1)-(4) and (b)(1).

28.    The Plaintiff Class is defined and proposed as follows:

All individual persons in the State of South Carolina who own, owned and/or purchased disability insurance coverage and/or paid premiums for disability insurance known as HealthExtras with the Defendants from 2000 through the date of class certification. Collectively, these persons will be referred to as the "Class." Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate. Excluded from the Plaintiff Class are:

a.    Defendants and any entities in which any Defendant has a controlling interest;

b.    Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of any Defendant;

c.    The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer or employees assigned to this case;

d.    Claims for personal injury, wrongful death, and/or emotional distress;

e.    Actual identifiable claims for disability benefits that have already arisen that may be payable under the terms of said disability insurance policies;

f.    Any attorneys representing the Plaintiff or the Class;

g.  All governmental entities; and

h.  Any person having entered into a release of claims with the Defendants concerning these allegations prior to the certification of this class.

29.  Numerosity – Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that their individual joinder is impracticable. The exact number or identification of the Class Members is presently unknown, but it is believed there are over 100 and most likely thousands of Class Members. The identity of the Class Members is ascertainable. In addition to registration rolls maintained by the Defendants, the Class Members may be located and informed of the pendency of this action by a combination of electronic bulletins, e-mail, direct mail and public notice, or other means.

30.  Predominance of Common Questions – Fed. R. Civ. P. 23(a)(2); 23(b)(3). Common questions of law and fact exist as to all the Class Members and predominate over questions affecting only individual Class Members. These common questions include the following:

a.  Whether Defendants sold disability insurance and collected premiums for those insurance policies that were illegal under the law of the State of South Carolina;

b.  Whether Defendants illegally sold disability insurance and collected premiums for those policies to a group of South Carolina residents that was not and could not be a legal "blanket group" under S.C. Code Ann. § 39-5-10, *et seq*.;

c.  Whether Defendants wrongfully collected premiums for those illegal policies;

d.  Whether any Defendants knew or should have known that selling and collecting premiums for the subject insurance policies was illegal pursuant to applicable

South Carolina law and in derogation of the State of South Carolina's interest in regulating the sale of insurance within its borders;

e.   Whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class Members;

f.   Whether Defendants admitted the allegations herein by cancelling the policy;

g.   Whether Defendants acted in conspiracy with each other to perform the illegal acts described herein;

h.   Whether Plaintiff and the Class Members suffered any injury that was proximately caused by the unlawful acts alleged herein; and

i.   Whether Plaintiff and the Class Members are entitled to recover damages proximately caused by the alleged unlawful conduct, including actual damages consisting of restitution of premiums collected for the illegal policies, other compensatory damages, punitive damages, treble damages, interest, attorneys' fees, filing fees and reasonable costs of suit.

31.    Typicality – Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of claims of all of the Class Members, all of whom owned or purchased disability insurance coverage and accident and sickness coverage or paid premiums for disability insurance coverage and accident and sickness coverage through a program known as HealthExtras from 1999 through the present date.

32.    Adequacy – Fed. R. Civ. P. 23(a)(4); 23(g)(1). Plaintiff is an adequate representatives of the Class because she fits within the class definition and her interests do not conflict with the interests of the Class Members she seeks to represent. Plaintiff will prosecute this action vigorously for the benefit of the entire Class, she agrees to participate in discovery,

11

and attend any Court hearings required of her. Plaintiff is represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as Class Counsel. Class Counsel has litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiff and Class Counsel can fairly and adequately protect the interests of all Class Members.

33.    Superiority – Fed. R. Civ. P. 23(b)(3). The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The class, as defined herein, is ascertainable from Defendants' records or from records which the Defendants have access and control.

## Historical Background and Factual Allegations

34.    Beginning in approximately 1997, Catamaran conceived, designed, and created a Disability Benefit Scheme (the "HealthExtras Scheme"). Catamaran contracted with the late famed Superman actor, Christopher Reeve, to endorse the HealthExtras Scheme. The development of the HealthExtras Scheme was initially funded by private investment with additional capital raised in 1999 through a public stock offering. The HealthExtras Scheme included: (1) a One Million Dollar ($1,000,000.00) Accidental Permanent and Total Disability Benefit insurance coverage; and (2) an Out of Area Emergency Accident and Sickness Medical Expense Benefit.

35.    The insurance coverage for the benefits was advertised, sold, and issued under the name "HealthExtras," and was underwritten by several insurance companies because Defendant

Catamaran was never licensed or authorized by any State or Department of Insurance to conduct the business of insurance.

36.     Catamaran's incorporators, including but not limited to, David Blair, CEO of HealthExtras Inc., conceived the HealthExtras Scheme for the purpose of defrauding consumers and gaining an unfair and illegal advantage in the disability insurance market by avoiding state insurance regulations and selling virtually worthless blanket group and group disability insurance to individuals rather than an actual qualified group.

37.     The HealthExtras Scheme operated in the following manner:

    a.  Based on the Group Health Insurance Model Act set out by the National Association of Insurance Commissioners ("NAIC"), the national governing body of the business of insurance, most states, including South Carolina, have enacted regulations (model acts) that require Blanket Group Disability Policies to be sold only to an employer, or a group which has been otherwise organized and is maintained in good faith for purposes other than that of obtaining insurance.

    b.  Under the Model Act and South Carolina law, a group or association may not be controlled by the insurer and the policy must be issued to a group or association which shall be deemed the policyholder.

    c.  Requiring Blanket Group Disability Policies to be issued to a "group" allows the group, as the entity with the insurable interest in its members, to scrutinize the terms of coverage and price of coverage to ensure its members are receiving a good insurance product for a fair price. Under these regulations, a Master Policy of insurance is required to be issued to the "group" with certificates of insurance issued by the group to the individual members.

d. Catamaran, f/k/a, Catalyst f/k/a HealthExtras Inc., and its incorporators gained an unfair advantage in the disability insurance market by unilaterally creating their own fictitious "group" and directly marketing an illusory disability policy to individual consumers; then once enrolled, placing that consumer in the fictitious "group" in the name of HealthExtras to conceal the scheme.

38.    Catamaran, f/k/a, Catalyst f/k/a HealthExtras Inc. and its incorporators achieved the unfair advantage and fraud on the public by concealing the scheme for the purpose of avoiding South Carolina law in the following manner:

a. HealthExtras Inc. entered into agreements with the nation's largest VISA and MasterCard issuing banks (including, but not limited to, Citibank, Capital One, and Chase), as well as American Express, and with "other entities" who held branded credit cards for their customers (including, but not limited to, JC Penny, Sears, and Conoco Phillips) granting Catamaran, f/k/a Catalyst, f/k/a HealthExtras Inc., access to their credit card customers to market the HealthExtras Scheme in all fifty (50) States of the United States of America and the District of Columbia.

b. These contracts granted Catamaran access to financial information of the cardholder to assess the prospect of that individual purchasing the HealthExtras Scheme.

c. By agreement, the credit card issuing companies allowed Catamaran to include a marketing flyer in the cardholder's monthly credit card statements, which were delivered to the individual through the United States Mail targeting individual consumers for the HealthExtras Scheme.

d.  Originally, the marketing flyers offered a One Million Dollar ($1,000,000.00) disability insurance product called "HealthExtras" for as little as Nine Dollars and Ninety-Five cents ($9.95) per month or Fifteen Dollars and Ninety cents ($15.90) per month depending on whether the individual added his or her spouse.

e.  The marketing flyers contained images of the late famed Superman actor, Christopher Reeve, well-known for his quadriplegia resulting from an equestrian accident, as well as Mr. Reeve's statements endorsing the HealthExtras Program.

f.  Included in the marketing flyers was a short application that allowed the individual cardholder to enroll in the HealthExtras Scheme by simply completing the application and sending it via the United States Mail in a prepaid envelope to HealthExtras, Inc. This process allowed Catamaran, f/k/a Catalyst, f/k/a HealthExtras Inc., to enroll large numbers of individual consumers rapidly with very little expense and with no lengthy applications or exams which would be typical of underwriting an individual disability policy.

g.  Once the individual cardholder sent the application to Catamaran, f/k/a Catalyst, f/k/a HealthExtras Inc., he or she was designated as a "member" of a fictitious group and placed into said group created by Catamaran, f/k/a Catalyst f/k/a, HealthExtras Inc., and other Defendants, along with other credit card holders from all 50 States. Catamaran, f/k/a Catalyst, f/k/a HealthExtras Inc., then began debiting the individual's credit card on a monthly or yearly basis for the insurance premium. Those premiums were then deposited into an account held under the name of the fictitious group under the name HealthExtras, Inc., or a bogus trust

under the name "HealthExtras" and distributed to the underwriters, the brokers, and to Catamaran, f/k/a Catalyst, f/k/a HealthExtras Inc.

h. Catamaran, f/k/a Catalyst, f/k/a HealthExtras Inc., entered into contracts with various licensed insurance carriers including Stonebridge and Virginia Surety to make application to each state insurance department for approval of the insurance products offered by HealthExtras and to underwrite the insurance benefits for the HealthExtras Scheme.

i. The underwriters either misrepresented to the state insurance regulators that the policy was intended to be issued to a valid group under state law or intentionally failed to apply for approval.

39. This illegal scheme allowed Catamaran to market and sell the illegal group policies directly to individuals and collect premiums directly from individuals, rather than from a lawful and legitimate group where members pay membership fees and their interests are protected.

40. This illegal scheme allowed Catamaran to reap enormous profits. After the Initial Public Offering ("IPO") of HealthExtras Inc., in 1999, in a year 2000 letter to the HealthExtras, Inc. shareholders, CEO David Blair reported:

> "Our revenues increased from $5.3 million in 1999 to $44.2 million in 2000 as our paid enrollments jumped from 105,000 to 450,000 over that period. The increase in enrollments was primarily attributable to the addition of new marketing partners and obtaining approval to sell our products in more states."

*See* **Exhibit D**.

41. This enormous immediate profit was created in the insurance market due to the fact that Catamaran avoided state insurance regulations requiring the policy to be sold to an

actual valid group, as defined by state law, rather than to individuals. Avoiding insurance regulation, rate oversight and the scrutiny of an actual group allowed Catamaran to fraudulently market and sell illegal group disability policies known as the HealthExtras Program to individuals on a large nationwide scale. These policies, disguised as inexpensive individual disability policies, were then issued to fictitious groups or trusts formed by Defendants to create the illusion of a valid group. This was a successful scheme to avoid state regulatory scrutiny and to avoid the scrutiny of an actual group and has been perpetrated in South Carolina for nearly 15 years.

42.    The fraudulent HealthExtras Scheme resulted in a huge financial windfall for HealthExtras, Inc. and CEO David Blair. After HealthExtras Inc. and its successor corporation Catalyst Health Solutions were sold for $4.4 billion to SXC Health Solutions in July 2012, creating the company now known as Catamaran Health Solutions, LLC, David Blair received a $16 million dollar compensation package in 2012 according to a Securities & Exchange Commission filing. He had earned $9.4 million in 2011.

43.    Catamaran knew any underwriter of such insurance would necessarily be required to comply with the insurance regulations of the various fifty (50) states and knowingly conceived and developed the HealthExtras Scheme to create the illusion of an actual and valid group or persons for the purposes of avoiding state insurance regulations and defrauding the public.

44.    Upon information and belief, in accordance with the HealthExtras Scheme, sometime in 2000-02, Plaintiff received marketing materials from the Defendants.

45.    Prior to the issuance of the marketing materials, Catamaran retained and utilized the likeness of "Superman" actor, Christopher Reeve, to be the face of its marketing campaign

after the famous actor had become paralyzed as a result of an equestrian accident, which was well documented in the national media.

46.     After receiving written solicitations, Plaintiff enrolled in the HealthExtras "benefit program" and agreed to pay premiums which subsequently appeared as charges/debits on her credit card statements and subsequently her bank statement. Catamaran accepted the respective named Plaintiff's enrollment even though it was not an insurance broker of licensed to conduct the business of insurance in South Carolina. Plaintiff paid the HealthExtras insurance premiums through December 31, 2014 when the program was canceled.

47.     Facing class action litigation regarding this illegal scheme in several jurisdictions, after over fifteen (15) years of collecting premiums for HealthExtras Scheme, Defendants canceled the insurance effective December 31, 2014. Without explanation, by letter dated November 14, 2014, Defendants sent via the United States mail, a letter to Plaintiff and all victims of the HealthExtras Scheme nationwide, including residents of South Carolina stating:

> "Thank you for being a long standing customer of the HealthExtras Program.  We are writing to notify you that the respective insurance coverages in the Program, underwritten by Stonebridge Life Insurance Company ("Stonebridge Life") and Virginia Surety Company ("Virginia Surety"), are terminating as of December 31, 2014.  As a result, we regret that we cannot continue the HealthExtras Program."

*See* **Exhibit A**.

48.     The HealthExtras Scheme is now a part of history, except for the issue of returning the illegally collected premiums to its victims.

## The HealthExtras Scheme was a Fraud on the Public

49.     The marketing materials for the HealthExtras Program represented affordable coverage for low probability, high consequence events, such as disability. Neither in those

materials nor anywhere else, however, did any Defendant ever disclose nearly all the purported premiums paid by Plaintiff and the Class Members went to marketing expenses and profits for Catamaran, or fees paid to banks that made their credit card customer information available to HealthExtras for marketing purposes.

50.    Upon information and belief, a small amount of the premium paid by members for disability coverage actually went to an insurance company for insurance coverage and the rest  has been collected by the HealthExtras entities (HealthExtras, Inc., Catalyst Health Solutions, Inc., Catamaran Health Solutions, LLC and HealthExtras, LLC) for use of the HeathExtras entities and its marketing partners and has not paid for insurance coverage or paid for anything that would benefit the Plaintiffs or the Class Members.

51.    Persons who purchased purported disability insurance coverage under the HealthExtras Scheme have been denied disability benefits even after suffering catastrophic injuries rendering those disabled as the policy terms contained in the Master Policy was delivered to "HealthExtras" as the fictitious "policyholder" and not provided to the Plaintiff or the Class Members.

**The HealthExtras' Insurance Policy Was Illegal under South Carolina Law**

52.    Blanket group policies differ from individual policies in that a single master policy is issued to a group or association, as opposed to the individual person being insured. Thus, the group or association is the actual policyholder. Each member of the group or association that is provided coverage under the master policy is issued a Certificate of Insurance that summarizes the coverage terms and explains the individual's rights under the master policy.

53.    South Carolina Department of Insurance Regulation 69-3 defines blanket insurance as follows:

> Insurance which contemplates that the risk is shifting, fluctuating or varying, and which covers a class of property or persons rather than any particular thing or persons.

54.    South Carolina Department of Insurance Regulation 69-3 defines group insurance as follows:

> A form of personal insurance which is issued to members of an organized body qualified, and not specifically prohibited, to be an insured, in which individual insurances are placed upon the persons of each member of that group but in which the group acts as an entity in the payment of premiums, inception of the contract, and the like.

55.    South Carolina Code Ann. § 38-71-720 provides, in pertinent part:

> (A) A policy or contract of group accident, group health, or group accident and health insurance may not be issued or delivered in this State, nor may any application, endorsement, or rider which becomes a part of the policy be used, until a copy of the form has been filed with and approved by the director or his designed except as exempted by the director or his designee as permitted by Section 38-61-20.

56.    South Carolina Code Ann. § 38-71-730 provides, in pertinent part:

> No policy of group health, group accident, or group accident and health insurance may be delivered or issued for delivery in this State unless it conforms to the following description:
>
> (1) Except as provided in this item, the policy is issued to a trust or to insure two or more persons who are associated in a common group for purposes other than obtaining insurance. (emphasis added).

57.    The HealthExtras disability policy issued by Defendants to Plaintiff and others similarly situated was not issued to a valid blanket group pursuant to S.C. Code Ann. § 38-71-730 or any other section of the South Carolina Insurance Code, but instead was issued to HealthExtras, Inc., as the "Policyholder."  HealthExtras is not a group at all, but rather a

fictitious entity formed only for the purpose of selling insurance and therefore was and is ineligible pursuant to applicable South Carolina law.

58.    Stonebridge underwrote and issued the Policy numbers GM951, GM956, and D459 and issued a certificate to the Plaintiff and other South Carolina residents for disability coverage without ever having applied for approval with the South Carolina Department of Insurance. Upon information and belief, the South Carolina Department of Insurance has not approved any of the above-mentioned policies for sale to any eligible blanket groups in South Carolina or otherwise to any South Carolina consumers.

59.    Upon information and belief, the South Carolina Department of Insurance never approved the Stonebridge Policy numbers GM951, GM956, and D459 for sale to the Plaintiffs or for sale to any eligible blanket groups in South Carolina or otherwise to any South Carolina consumers as required under S.C. Code Ann. § 38-71-720, in direct violation of South Carolina law.

60.    Similarly, credit card holders are not a valid group under S.C. Code Ann. § 38-71-730. However, Stonebridge knowingly and with intent to violate South Carolina law agreed in writing with the other Defendants to market the HealthExtras Scheme and to continue to underwrite the illegal policy anyway.

61.    Despite statutory requirements and specific knowledge that a group of credit card holders were not a valid group for purposes of blanket or group accident polices, in an extraordinary display of self-dealing, Defendants Stonebridge, Catamaran, and others created a fictitious group and issued the policies to HealthExtras, Inc. as the "Policyholder." HealthExtras, Inc. was not an employer, or any other organization as defined under S.C. Code Ann. § 38-71-730. HealthExtras Inc. was not a group or association at all. HealthExtras, now Catamaran, was a

fictitious, illegal and sham company, with premiums collected for the benefit of it and its business partners, rather than a valid group of persons. There was no constitution or bylaws and the HealthExtras "members" had no voting privileges or representation on any boards or committees. This group was created for the sole purpose of selling the HealthExtras Scheme to consumers, while avoiding supervision and oversight of the South Carolina Department of Insurance in direct violation of South Carolina law.

62.     As a result of the issuance of the HealthExtras Program to persons who were not members of a lawful blanket group as set forth in detail herein, the HealthExtras Scheme is illegal under South Carolina law and is void.

63.     The illegal "HealthExtras" group to whom the insurance product was sold consists solely of persons whose only commonality is they have a credit card and were chosen by Catamaran, and others as a good marketing prospect for the HealthExtras Scheme. In fact, the putative South Carolina Class Members were not all customers of the same bank or credit card issuer.

64.     The HealthExtras Benefit Program sold to Plaintiff and all similarly situated South Carolina residents is illegal under South Carolina statutory law, as all South Carolina policyholders do not fall within a lawful blanket group, and the policies were devised and perpetrated by the Defendants to keep the "members" in the dark and to conceal the true nature of the HealthExtras Scheme.

65.     Catamaran, Stonebridge, and others formed and operated a sham group in order to circumvent regulatory supervision and scrutiny. Because there was no legitimate group, there was no one to look out for the interests of the persons paying for the purported disability insurance coverage. More specifically, there was no legitimate entity or organization to

scrutinize the scope of the coverage and whether it was reasonable for the amount paid, determine where the money paid for the purported coverage was going (i.e., whether it was being used to purchase insurance coverage or simply fuel for a marketing scheme), or monitor whether covered claims were actually being paid.

66.     Accordingly, pursuant to South Carolina law, the HealthExtras Program, for which fees have been collected by as far back as 1999, was illegal, could not have been approved to be sold to the purported group of persons by the South Carolina Department of Insurance, is therefore void as against public policy and constitutes an unlawful and deceptive trade practice pursuant S.C. Code Ann. §39-5-10.

67.     Plaintiffs and all similarly situated South Carolina residents were charged premiums for the illegal coverage provided by these Defendants.

68.     The purpose of the noncompliance with the requirement the group be "formed for the purposes other than obtaining insurance" by Catamaran, Stonebridge, and others was to avoid the policy being issued to an actual group of persons. If the policy had been issued to an actual group of persons that was organized together for some purpose other than obtaining insurance, the policy, the advertised promises, the excessive premiums, and the broad, harsh exclusions that make recovery under the policy virtually impossible, would have been subject to scrutiny by an actual group of persons. A lawful group of persons would have had the opportunity to determine the relative merit and value of the policy before providing its members with the opportunity to purchase it. Because there was no legitimate group or organization involved, there was no mechanism or structure for purchasers of disability coverage to communicate with one another concerning cost, coverage, or payment of claims.

69.    The HealthExtras Scheme succeeded in allowing Catamaran, Stonebridge, and Virginia Surety to circumvent the law and gain an unprecedented and unfair advantage in the market against companies offering legitimate disability policies. It derived credibility from a spokesperson who was a well-liked and respected actor who had suffered a tragic accident. That credibility was ultimately further enhanced by the participation of Stonebridge and Virginia Surety.

70.    The HealthExtras Scheme targeted a large pool of potential customers who, although purportedly members of a group, in fact had no legitimate organization or entity protecting their interests and no mechanism for learning this fact. Victims of the HealthExtras Scheme had no way of knowing that only a small fraction of the money they were paying for coverage ever went to an insurance company, did not know the policy holder was a sham organization and the alter-ego and instrumentality of the perpetrators of the scheme, and did not know the purported insurance coverage they were purchasing was illegal.

71.    Due to the nature of the HealthExtras Scheme, Defendants are equitably estopped from asserting any statute of limitations defense otherwise applicable to the claims of Plaintiff and Class Members as the representations made to Plaintiff and Class members, specifically the explicit representations of coverage, the implicit representation of that coverage being valid rather than void, the failure of Defendants to provide both the policy forms and Master Policy to them, and the representation that Plaintiff and Class Members were part of valid blanket group prevented them from recognizing the void nature of the subject policies and thus the causes of action based on the void nature of said policies.

72.     Plaintiff and others similarly situated would have had a confidential relationship of trust and confidence with a legitimate group. By creating a sham group to facilitate the HealthExtras Scheme, Defendants assumed the obligations of that confidential relationship.

**A Scheme of False and Deceptive Advertising**

73.     Upon information and belief, Catamaran, in concert and conspiracy with the other Defendants Stonebridge, and others directly targeted Plaintiff and other South Carolina residents before and after enrollment in the HealthExtras Scheme with direct mail advertisements and phone calls that included, but are not limited to the following misleading statements:

a.  This program provides valuable protection in the event you become permanently totally disabled due to an accident.

b.  This HealthExtras Benefit Program provides you with a $1,000,000 tax free cash payment if you're permanently disabled due to an accident.

c.  If an accident leaves you   the primary member   permanently disabled, you will receive a lump sum payment of $1,000,000.

d.  After 12 months of continuing and permanent disability caused by an accident including the inability to work the primary member will receive a payment of $1,000,000.

e.  You're covered with a $1,000,000 tax free cash payment if you are permanently disabled as a result of an accident.

74.     However, in sharp contrast to the HealthExtras advertisements, the HealthExtras policies are replete with extremely harsh, restrictive and confusing exclusions and contradictory terms and definitions which intentionally renders the policy virtually worthless to purchasers.

75.     Catamaran in concert and conspiracy with Stonebridge developed the language and harsh exclusions HealthExtras Policy as well as the deceptive marketing material sent to South Carolina residents.

76.     Catamaran, in concert and conspiracy with Stonebridge developed the HealthExtras Policy with no intent to ever pay disability claims and the specific intent to deny any disability claims made by victims of the HealthExtras Scheme.

77.     Catamaran, specifically agreed with Stonebridge to jointly develop and author the terms of the HealthExtras Policy with no intent to ever pay disability claims and with the specific intent to deny any disability claims made by victims of the HealthExtras Scheme.

78.     There are many examples in the public record of victims of the HealthExtras Scheme being denied disability benefits after suffering catastrophic injuries as Stonebridge and other underwriters of the HealthExtras Scheme have used and continue to use harsh and confusing exclusions written in the policies to deny valid disability claims.  These harsh exclusions were never reviewed or approved by the South Carolina Department of Insurance and never scrutinized by a valid group as required under South Carolina law and South Carolina public policy.

79.     For nearly 15 years, the various underwriters engaged by Catamaran have used the harsh and restrictive exclusions in the HealthExtras Policy to deny disability claims while collecting millions of dollars from South Carolina residents and residents in all 50 states.

80.     Upon information and belief, Catamaran and Stonebridge entered into agreements to develop and market the HealthExtras Scheme that is illegal under South Carolina law. Each of these Defendants took actions to form a fictitious group which has been used to create the illusion of a valid group for the purpose of avoiding South Carolina insurance regulations in

order to market, sell and profit from the HealthExtras Scheme, which is illegal under South Carolina law.

81.    Upon information and belief, Stonebridge and Catamaran agreed that Stonebridge would use the name HealthExras and the likeness and endorsements of Christopher Reeve on direct mail advertisements and other media mailed via the United States Mail from the Stonebridge offices in Plano, Texas, to market the HealthExtras Scheme.

82.    Catamaran and Stonebridge entered into agreements with each other that formed the HealthExtras Scheme which they knew to be illegal under South Carolina law and each Defendant received money and profited from the illegal scheme.

83.    Therefore, Plaintiff and all other similarly situated South Carolina residents were charged premiums by these Defendants that were illegal under South Carolina statutes and Department of Insurance regulations and were thus proximately damaged by the actions of Defendants as the insurance product they paid for was never approved, could never be approved under State law, and was virtually worthless as there was no intent on behalf of the underwriters to pay claims.

84.    As a direct result of Defendants' conspiratorial actions as described herein, Plaintiff and the putative Class Members have suffered damages that include, but not limited to: (1) paying for an insurance product sold to them through an illegal scheme, where most of the premium was collected by Catamaran, and represented no benefit to them at all; (2) paying for an insurance product sold to them through an illegal scheme, where the underwriters had no intent to pay claims and was therefore virtually worthless; and (3)  paying a premium for an insurance product that was illegal under South Carolina law and therefore, void.

**Defendant Stonebridge's Participation
in the HealthExtras Scheme**

85.     Defendant Stonebridge's participation in the HealthExtras Scheme includes, but is not limited to the following:

86.     Catamaran, was never licensed to conduct the business of insurance anywhere.

87.     Catamaran participated in developing the policy language and upon information and belief, determined the amount of premiums charged.

88.     The purported disability insurance underwriter, Stonebridge, accepted payments to lend credibility to the HealthExtras Scheme, but did not possess any intention to pay claims.

89.     Stonebridge, with specific knowledge and intent to violate South Carolina law, entered into agreements to develop and market the HealthExtras Scheme that is illegal and also took actions to form a fictitious group which has been used to create the illusion of a valid group for the purpose of avoiding South Carolina insurance regulations in order to market, sell, and profit from the HealthExtras Scheme.

90.     Under the HealthExtras Scheme, Stonebridge underwrote and issued the Policy numbers GM951, GM956, and D459 to the Plaintiff and other residents of South Carolina for disability coverage in the amount of $1,000,000.00 without ever having applied for approval with the South Carolina Department of Insurance as required under South Carolina Code Ann. § 38-71-720 in direct violation of South Carolina law.

91.     Stonebridge participated in developing the policy series at issue with no intent to pay disability claims and the specific intent to deny any disability claims made by the HealthExtras Scheme's victims.

92.      Upon information and belief, Stonebridge knew Catamaran was not a licensed insurance broker and could not legally solicit consumers to purchase the disability insurance known as the HealthExtras Program.

93.      Upon information and belief, Stonebridge knowingly allowed Catamaran to use its name on pre-printed forms from the HealthExtras offices in Rockville, Maryland, to solicit consumers in South Carolina to buy disability insurance known as the HealthExtras Program.

94.      Upon information and belief, Stonebridge used pre-printed forms with the name "HealthExtras" from its offices in in Plano, Texas, to solicit consumers in South Carolina to buy disability insurance known as the HealthExtras Program with specific knowledge that the insurance program was illegal.

95.      Upon information and belief, Stonebridge knew the fictitious group formed did not constitute a valid group under South Carolina law. However, Stonebridge chose to agree to market with the other Defendants and to continue to underwrite the HealthExtras Scheme anyway.

96.      Upon information and belief, Stonebridge received fees from the HealthExtras Scheme that it knew to be illegal.

97.      In fact, Stonebridge has continued its deceitful participation in the HealthExtras Scheme by mailing the HealthExtras Program cancelation letters via the United States mail, to all victims of the HealthExtras Scheme, nationwide, including residents to South Carolina stating:

> "Thank you for being a long standing customer of the HealthExtras Program.  We are writing to notify you that the respective insurance coverages in the Program, underwritten by Stonebridge Life Insurance Company ("Stonebridge Life") and Virginia Surety Company ("Virginia Surety"). Are terminating as of December 31, 2014. As a result, we regret that we cannot continue the HealthExtras Program."

See **Exhibit A**.

98.    Upon information and belief, neither HealthExtras, Inc., nor any other Healthextras entity has, or has ever had, an office in Texas. Despite the fact there has never been a "HeathExtras" office in Texas, Stonebridge sent the November 14, 2014, HealthExtras cancelation letters on "HeathExtras" letterhead falsely claiming that the said letters were sent from the "HealthExtas Administrative Office, 2700 West Plano Parkway, Plano TX 75075."

### Joint Enterprise and Conspiracy to Deceive the Public and Violate South Carolina Law

99.    All Defendants engaged in a joint enterprise and conspiracy to utilize their efforts to sell, broker, underwrite, collect, allocate, and share premiums derived from the HealthExtras Scheme to Plaintiff and the putative Class Members, for their own individual and mutual benefit, without fully disclosing to Plaintiff and the putative Class Members that the policies being sold to them did not, and could not, comply with South Carolina law, and lack of compliance was material information about such policies and a willful violation of South Carolina law.

100.    Defendants engaged in agreements for a common purpose, a common pecuniary interest, and a joint venture to share illegal profits and all Defendants engaged in at least one act in furtherance of the illegal HealthExtras Scheme.

101.    As a direct result of all the Defendants' conspiratorial actions as described herein, Plaintiff and the putative Class Members have suffered damages that include, but are not limited to: (1) paying for an insurance product sold to them through an illegal scheme, where most of the premium was collected by Catamaran, and represented no benefit to them at all; (2) paying for an insurance product sold to them through an illegal scheme, where the underwriters had no intent to pay claims and was therefore virtually worthless; and (3)  paying a premium for an insurance product that was illegal and void under South Carolina law.

102.    As a result, the Defendants are jointly and severally liable for any and all damages or restitution the Plaintiffs and Class Members are entitled to recover in this action.

**COUNT ONE**
**(Unfair Deceptive Trade Practices Claim Pursuant to**
**South Carolina Code Ann. § 39-5-10, et al.)**
**All Defendants**

103.    Plaintiff, on behalf of herself and all other similarly situated South Carolina residents, reasserts and re-alleges every paragraph contained in this Complaint as if set forth more fully herein and further allege:

104.    Catamaran's sale, marketing, collection, retention, and allocation of fees and premiums, as described herein, for HealthExtras Scheme from Plaintiff and all other similarly situated South Carolina residents constitutes a violation of S.C. Code Ann. § 39-5-10, *et al.*, because Defendants' conduct was    illegal, deceptive, immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

105.    Stonebridge's receipt and sharing of sums collected from Plaintiff and putative class members, as described herein, by Catamaran constitutes a violation of S.C. Code Ann. § 39-5-10, *et al.*, because Defendants' conduct was illegal, deceptive, immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

106.    Stonebridge's role in underwriting the unlawful policies constitutes a violation of S.C. Code Ann. § 39-5-10, *et al.*, because Defendants' conduct was illegal, deceptive, immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

107.    The only unifying characteristic of the HealthExtras "group" of insured persons is the fact that these persons have credit card accounts. The HealthExtras Scheme was created for the sole purpose of obtaining and placing insurance in a fictitious group in order to avoid state insurance laws and defraud consumers. A valid group did not exist, was not approved by the

South Carolina Department of Insurance and, in fact, could never be so approved pursuant to S.C. Code Ann. § 38-71-10, *et al.*, because the group was formed solely for the purpose of obtaining insurance and for no other reason.

108.    These Defendants engaged in "commerce" in the State of South Carolina and Defendants willfully and deliberately  marketed, sold, collected, and shared illegal fees and premiums from Plaintiff and other similarly situated South Carolina residents for an insurance policy and premium rates that were not approved, and could never be approved, by the South Carolina Department of Insurance and is void as a matter of law. Accordingly, Catamaran and Stonebridge have received illegal premiums since 2000.

109.    These Defendants have proximately caused damages to Plaintiff and similarly situated South Carolina residents by the sale of the subject policies and continuing collection of premiums as the premiums collected by and shared among Defendants are for policies that were not approved, and could never be approved, by the South Carolina Department of Insurance under South Carolina law. Accordingly, Plaintiff and similarly situated South Carolina residents have suffered a monetary loss of premiums paid for the HealthExtras policies that were not approved, and could never be approved, by the South Carolina Department of Insurance under South Carolina law and are thus void.

110.    Plaintiff and other similarly situated South Carolina residents have been proximately injured as a result of Defendants' deceptive actions and are thus entitled to damages proximately caused to them as allowable under S.C. Code Ann. § 38-71-10, *et al.*, in the amount of fees and premiums paid by them and trebled in accordance with statutory law, including attorneys' fees and costs.

## COUNT TWO
### (Breach of the Duty of Good Faith and Fair Dealing)
### All Defendants

111.     Plaintiff, on behalf of herself and all other similarly situated South Carolina residents, reasserts and re-alleges every paragraph contained in this Complaint as if set forth more fully herein and further allege:

112.     Defendants have breached the duty of good faith and fair dealing to Plaintiff, and similarly situated South Carolina residents by engaging in the conduct set forth hereinabove.

113.     Defendants, individually and collectively, knew that the South Carolina Department of Insurance did not authorize the sale the subject policies and collection premiums for the HealthExtras Benefit Program to individuals who were not members of a lawful "blanket group." Instead Defendants used the guise of a fictitious group in place of a lawful blanket group.

114.     Despite Defendants' collective knowledge, Defendants failed to reveal to Plaintiff and other similarly situated South Carolina residents that the HealthExtras Program was illegal and void, that their premiums were thus illegal and not approved, that they paid for void policies, and that they were not part of any lawful blanket group.

115.     Despite this duty, Defendants sold the HealthExtras Program, collected premiums and shared the monies collected from Plaintiffsand other similarly situated South Carolina residents and thus breached the duty of good faith and fair dealing as a matter of law. This breach proximately caused damages to Plaintiffs and other similarly situated South Carolina residents.

116.     Plaintiffs and other similarly situated South Carolina residents have been proximately injured as a result of the Defendants' breach of the duty of good faith and fair dealing and are thus entitled to damages proximately caused them by said breach.

**COUNT THREE**
**(Unjust Enrichment)**
**All Defendants**

117.     Plaintiff, on behalf of herself and all other similarly situated South Carolina residents, reasserts and re-alleges every paragraph contained in this Complaint as if set forth more fully herein and further allege:

118.     When seeking to purchase disability insurance, Plaintiff and the Class Members had a choice of various underwriters, coverage amounts, and coverage terms.

119.     Plaintiff and other similarly situated South Carolina residents purchased the HealthExtras insurance coverage due to the relatively low price point, its high coverage amount and other market based factors, including the marketing and likeness of HealthExtras Spokesperson, Christopher Reeve.

120.     Plaintiffs and the Class Members purchased their disability insurance in order to protect themselves should they suffer disability as a result of an accidental injury.

121.     Defendants, individually and collectively, failed to disclose that the insurance coverage being sold to Plaintiff and the Class Members was illegal under South Carolina law in that Plaintiff and the Class Members were not members of a legal "blanket group."

122.     By purchasing the HealthExtras coverage and paying premiums, Plaintiff and the Class Members conferred a benefit upon the Defendants, without knowledge that the coverage was illegal and thus void.

123.     Defendants knowingly accepted and retained this non-gratuitous benefit conferred on them by Plaintiff and the Class Members despite Defendants' knowledge the subject policy was illegal as a matter of South Carolina law for the reasons enumerated herein.

124.     Plaintiff and the Class Members have spent hundreds or thousands of dollars in premium payments for an illegal policy that was not approved, or that could never be approved,

by the South Carolina Department of Insurance or lawfully sold to South Carolina residents, and is now cancelled.

125.      Defendants have been unjustly enriched in retaining the payments paid by Plaintiff and the Class Members for the disability coverage.

126.      Defendants' retention of the non-gratuitous benefit conferred by Plaintiff and the Class Members under these circumstances is unjust and inequitable.

127.      No other remedy at law can adequately compensate Plaintiff and the Class Members for the economic damages resulting from Defendants' wrongful actions as alleged herein.

128.      Because Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff and the Class Members is unjust and inequitable, Defendants' must pay restitution to Plaintiff and the Class Members for its unjust enrichment, as ordered by the Court.

### COUNT FOUR
**(Civil Conspiracy)**
**All Defendants**

129.      Plaintiff, on behalf of herself and all other similarly situated South Carolina residents, reasserts and re-alleges every paragraph contained in this Complaint as if set forth more fully herein and further allege:

130.      All Defendants engaged in a conspiracy to utilize their efforts to sell, broker, underwrite, collect, allocate, and share premiums derived from the HealthExtras Scheme to the Plaintiff and the putative Class Members, for their own individual and mutual benefit, without fully disclosing to Plaintiff and the putative Class Members that the policies being sold to them did not and could not comply with South Carolina law, said lack of compliance being material information about such policies. Further, this lack of disclosure constitutes an omission of

material fact regarding the insurance product as the same have no value due to it being void as against public policy.

131.    Upon information and belief, each of the Defendants took actions to form and perpetuate the HealthExtras Scheme which has been used to create the illusion of a valid group for the purpose of avoiding South Carolina insurance regulations in order to market, sell, and profit from the HealthExtras Scheme, which is illegal under South Carolina law.

132.    As a result, Plaintiff and the putative Class Members purchased, paid for, and retained HealthExtras disability insurance policies that were illegally solicited, marketed, sold, brokered, serviced, underwritten, and administered by Defendants, and paid to Defendants bi-monthly, quarterly, or annual premiums for an insurance product that provided no benefit.

133.    In the marketing, sale, brokerage, servicing, underwriting and administration of the illegal policies as set forth herein, all Defendants agreed and conspired, as described herein, for the purpose of lawful activities by unlawful means, or unlawful activities by lawful means.

134.    Each Defendant committed at least one overt act, as described herein, in furtherance of the aims of the agreement and pursuant to a common scheme.

135.    As a direct result of Defendants' conspiratorial actions, Plaintiff and the putative Class Members have suffered damages as: (1) they paid a premium for an insurance product that was illegal, (2) they paid for an insurance product where most of the premium was collected by Catamaran and represented no benefit to them at all; and (3) they paid for an insurance product where the underwriters had no intent to pay claims and therefore was virtually worthless.

## COUNT FIVE
### (Breach of Contract and the Duty of Good Faith and Fair Dealing)
### All Defendants

136.     Plaintiff realleges and incorporates by reference each and every allegations set forth in the preceding paragraphs as if set forth herein.

137.     Plaintiff, along with the putative class members have or have had a contract with Catamaran and Stonebridge by virtue of the enrollment in the HealthExtras Program.

138.     Defendants have breached their contract with Plaintiff and similarly situated South Carolina residents and the duty of good faith and fair dealing owed in all contracts in South Carolina by engaging in the conduct set forth hereinabove.

139.     Defendants, individually and collectively, knew the HealthExtras disability policy could only be issued to legal "blanket groups", that the HealthExtras disability policies were sold to individuals who were not members of a lawful "blanket group" under South Carolina law, instead using the guise of insurance trusts in place of a lawful blanket group to sell Plaintiff, along with the putative Class Members virtually worthless disability policies that were developed and designed with no intent to pay claims disability claims.

140.     Despite each Defendants' collective knowledge, each Defendant failed to reveal to Plaintiff, and other similarly situated South Carolina residents, that their HealthExtras disability policies were illegal and of little value; their premiums were thus illegal and not approved; they paid for illegal policies; and they were not part of any lawful blanket group as required under South Carolina law.

141.     Despite this duty, Catamaran and Stonebridge directly sold, participated in the sale and/or ratified the sale of the illegal Blanket Accident Disability Insurance known as the HealthExtras Program.  Defendants collected premiums and fees from the Scheme and shared the

monies collected from Plaintiff, and other similarly situated South Carolina residents, thereby breaching the duty of good faith and fair dealing as a matter of law. This breach proximately caused damages to Plaintiff, and other similarly situated South Carolina residents.

142.     Plaintiff and other similarly situated South Carolina residents have been proximately injured as a result of each of the Defendants' breach of the duty of good faith and fair dealing and are thus entitled to damages proximately caused by the breach.

**COUNT SIX**
**(Breach of Contract Accompanied by a Fraudulent Act)**
**All Defendants**

143.     Plaintiff realleges and incorporates by reference each and every allegations set forth in the previous paragraphs as if set forth herein.

144.     Defendants' actions, omissions, concealments, and failures to act, as set forth in detail hereinabove, constitute breach of the insurance contract between Defendants and Plaintiff.

145.     Defendants' breach of contract was accompanied with fraudulent intent relating to the breach as evidenced by the circumstances surrounding the breach, to-wit: Defendants' numerous misrepresentations, omissions, concealment of material facts, illegal conduct, and improper conduct as set forth in detail hereinabove.

146.     As a result of Defendants' breach of contract accompanied by a fraudulent act, Plaintiff and the proposed Class Members have suffered actual and consequential damages.

147.     Defendants' breach of contract was accomplished with fraudulent intent and accompanied by a fraudulent act.

148.     Plaintiff is informed and believes he and the proposed Class Members are entitled to judgment against the Defendants, jointly and severally, for actual damages, compensatory damages and punitive damages for breach of contract accompanied by a fraudulent act.

## COUNT SEVEN
**(Violation of Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968)**
**All Defendants**

149.    Plaintiff realleges and incorporates by reference each and every allegations set forth in the preceding paragraphs as if set forth herein.

150.    Plaintiff is a "person" within the meaning of 18 U.S.C. § 1961(3).

151.    The predicate acts engaged in by Defendants that form the pattern of racketeering activity include theft by taking, theft by deception, mail fraud and wire fraud.

### Theft by Taking

152.    On more than two occasions, Catamaran and Stonebridge, individually, and as parties to a crime, committed, attempted to commit, solicited another to commit, or engaged in acts involving theft by taking of property belonging to Plaintiff and the Class Members.

153.    Catamaran and Stonebridge knowingly and repeatedly used false and misleading marketing materials, descriptions of coverage, and other representations of fact to induce the Plaintiffs and members of the class to purchase fraudulent, illusory and virtually worthless overpriced insurance that was in fact illegal under state law.

154.    Plaintiff's money constitutes property within the meaning of 18 U.S.C. § 1961. Catamaran and Stonebridge unlawfully took the money of Plaintiff and the Class Members with the intention of depriving them of that money.

155.    This conduct constitutes racketeering activity pursuant to 18 U.S.C. § 1961.

### Theft by Deception

156.    On more than two occasions, Catamaran and Stonebridge individually, and as parties to a crime, committed, attempted to commit, solicited another to commit, or engaged in

acts involving theft by deception, by obtaining property by deceitful means and artful practices, with the intention of depriving Plaintiff and other Class members of their property.

157.    Catamaran and Stonebridge committed theft by deception by creating or confirming Plaintiff's impression of existing facts or past events which were false and which those Defendants knew to be false, and failing to correct false impressions of existing facts or past events which they had previously created or confirmed.

158.    Catamaran and Stonebridge made these representations, creating and/or confirming the impressions of existing facts or past events which they had previously created or confirmed, even though Catamaran and Stonebridge knew or believed at the time of the representations that such statements were false and incorrect.

159.    Catamaran and Stonebridge made these representations, creating and confirming these impressions, in order to induce Plaintiff and other similarly situated individuals to purchase illegal, fraudulent, illusory, overpriced and virtually worthless insurance coverage, so that Defendants could obtain money from Plaintiff and other victims by deception.

160.    Catamaran and Stonebridge continued making fraudulent representations and/or confirming false impressions that they had previously created in order to induce Plaintiff and other similarly situated individuals to continue to pay for illegal, fraudulent, illusory and virtually worthless insurance.

161.    Despite having numerous opportunities to do so, the Catamaran and Stonebridge failed to correct the false impressions described above that they had previously created or confirmed.  Instead, they affirmatively concealed their wrongful actions from their victims.

162.     Catamaran and Stonebridge also prevented the Plaintiff from acquiring information pertinent to the disposition of their funds, including information that would have contradicted the false representations of fact in the marketing materials.

163.     This conduct constitutes racketeering activity pursuant to 18 U.S.C. § 1961.

### Mail Fraud

164.     Catamaran and Stonebridge engaged in multiple acts of mail fraud in violation of 18 U.S.C. 1341, by depositing or causing to be deposited, to be sent or delivered by the Postal Service, or any private or commercial interstate carrier, matters and things for the purpose of executing the HealthExtras Scheme. This included:

a.  Mailing or causing the mailing of fraudulent and misleading marketing materials relating to the solicitation of an illegal, fraudulent, illusory, and virtually worthless disability insurance;

b.  Mailing or causing the mailing of fraudulent and misleading information relating to the sale of an illegal, fraudulent, illusory, and virtually worthless insurance;

c.  Mailing or causing the mailing of fraudulent and misleading information relating to the illegal post-sale marketing of and illegal, fraudulent, illusory, and virtually worthless disability insurance;

d.  Mailing or causing the mailing of fraudulent and misleading information relating to the illegal creation of a fictitious group  in which to place this insurance for the purpose of  avoiding state insurance regulations and laws;

e.  Mailing or causing the mailing of information relating to the illegal calculation and collection of excessive premiums or "fees" charged for this illegal, fraudulent, illusory, and virtually worthless insurance product.

f.  Causing the mailing of credit card invoices containing charges for an illegal, fraudulent, illusory, and virtually worthless insurance.

g.  Causing the mailing of payments for credit card invoices containing charges for this illegal, fraudulent and virtually worthless insurance.

165.    Defendants' violations of 18 U.S.C. § 1341 constitute racketeering activity pursuant to 18 U.S.C. § 1961.

## Wire Fraud

166.    The Catamaran Defendants engaged in multiple acts of wire fraud in violation of 18 U.S.C. § 1343, by transmitting and causing to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the HealthExtras Scheme.  This included:

h.  Maintaining a website, www.healthextras.com, that transmitted misrepresentations in interstate commerce via electronic communications.  These included representations that HealthExtras provided "a cost-effective supplemental lifetime accidental disability insurance program that provides families with additional financial security should the unthinkable happen," and other similar misrepresentations. The website included a picture and embedded video conversation with actor Christopher Reeve.

i.   Causing Plaintiff's credit or debit card accounts to be charged or debited for premiums for an illegal, fraudulent, illusory and virtually worthless disability insurance, which transactions took place via electronic means in interstate commerce;

j.   Causing Plaintiff's checking account to be charged or debited for premiums for an illegal fraudulent, illusory and virtually worthless disability insurance policy, which transactions took place via electronic means in interstate commerce;

k.   Causing Plaintiff's bank account to be charged or debited for premiums for an illegal, fraudulent, illusory, and worthless disability insurance policy, and these transactions taking place via electronic means in interstate commerce.

l.   Using telephonic communications to directly solicit South Carolina residents to purchase the illegal, fraudulent, illusory, and virtually worthless disability insurance policy known as the HealthExtras Program,

167.     This conduct constitutes racketeering activity pursuant to 18 U.S.C. § 1961.

**The Acts of Racketeering Activity Are Related and Form a Pattern**

168.     The acts of racketeering activity committed by the Catamaran and Stonebridge had, among other things, the same or similar intents, results, victims, and methods of commission.

169.     The acts of racketeering activity involve the sale of an illegal, fraudulent, illusory, and virtually worthless disability insurance coverage.

170.     The acts of racketeering activity had the same or similar intents, in that they sought to obtain money through racketeering activity.

171.     The acts of racketeering activity had the same or similar results, in that the Defendants actually obtained money through racketeering activity.

172.     The acts of racketeering activity committed by the Catamaran Defendants had the same or similar victims: individual holders of credit cards who were deceptively induced to purchase an illegal, fraudulent, illusory, and virtually worthless disability insurance policy.

173.    The methods by which the incidents of racketeering activity were committed were the same or similar, including by way of example and not limitation, the use of false marketing materials, the creation of a sham group to which an insurance policy was supposedly sold, the creation of a sham trust, the deliberate evasion of applicable insurance laws and regulations, charging purported premiums of which only a small fraction were paid to an actual insurance company, charging purported premiums for insurance coverage that was illegal, fraudulent and illusory, and denying claims covered by the terms of the purported policy.

174.    The acts of racketeering activity are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission, the same or similar benefits to the perpetrators, the same or similar injuries to Plaintiff, and the same or similar efforts to conceal the perpetrators' misconduct.

175.    The acts of racketeering activity caused injury to Plaintiff and the Class Members.

176.    Catamaran and Stonebridge violated 18 U.S.C. § 1961 by obtaining, directly or indirectly, personal property consisting of money, through a pattern of racketeering activity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, demands judgment against Defendants, jointly and severally, as follows:

(a)    An order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class Representatives and his attorneys as Class Counsel to represent the Class Members;

(b)    An order declaring the HealthExtras disability policy illegal under South Carolina law and against public policy;

(c)     An order entering judgment in favor of Plaintiff, and the Class Members against the Defendants for damages under each of the above stated causes of action in an amount to be proven at trial;

(d)     An order awarding damages in the form of actual damages, treble damages, and punitive damages against Defendants in favor of Plaintiff and putative Class Members in an amount to be determined by the Court as fair and just given Defendants' wrongful conduct;

(e)     Injunctive relief in the form of an Order prohibiting further the Defendants' unlawful activities in the State of South Carolina or an order of such other non-monetary relief as may be necessary and proper; and

(f)     An order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses and costs, including costs of investigation reasonably incurred.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members hereby demand a jury trial on all claims so triable in this action.

Respectfully submitted,

**HOPKINS LAW FIRM, LLC**

  /s/ *William E. Hopkins, Jr.*
William E. Hopkins, Jr.  (Fed. I.D. #6075)
12019 Ocean Highway
Post Office Box 1885
Pawleys Island, South Carolina 29585
Telephone:     843-314-4202
Fax:               843-314-9365
bill@hopkinsfirm.com

HEMMINGS & STEVENS, PLLC
Aaron C. Hemmings, (NC State Bar No.: 29810)
(pending pro hac vice to be filed)

*Attorney for Plaintiff*
5613 Duraleigh Road, Suite 151
PO Box 90698
Raleigh, NC 27675
Telephone:     919-277-0161
Fax:              919-277-0162
ahemmings@hemmingsandstevens.com


THE AUGHTMAN LAW FIRM
Joseph "Jay" H. Aughtman (AL State Bar No. ASB-8081-A43J)
(pending pro hac vice to be filed)
*Attorney for Plaintiff*
1772 Platt Place
Montgomery, AL 36117
Telephone:     334-215-9873
Facsimile:     334-213-5663
jay@aughtmanlaw.com

*Attorneys for the Plaintiff and the Prospective Class*

July 20, 2015