UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| SHAREN SMITH, on behalf of herself and all others similarly situated, | ) ) ) | Civil Action No.: 3:15-2846-BHH |
| | ) | |
| Plaintiffs, | ) ) | |
| vs. | ) | **Opinion and Order** |
| | ) | |
| CATAMARAN HEALTH SOLUTIONS, LLC, f/k/a CATALYST HEALTH SOLUTIONS, INC., f/k/a HEALTHEXTRAS, INC., and STONEBRIDGE LIFE INSURANCE COMPANY, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| _____ | ) | |

This matter is before the Court on Defendants' Catamaran Health Solutions, LLC, f/k/a Catalyst Health Solutions, Inc., f/k/a HealthExtras, Inc. ("Catamaran Defendants" or "HealthExtras")[1] and Stonebridge Life Insurance Company ("Stonebridge") Motion to Dismiss (ECF No. 13) Plaintiff Sharen Smith's Class Action Complaint (ECF No. 1) for lack of standing and failure to state a plausible claim for relief, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth in this Order, Defendants' Motion is granted and the case is dismissed.

## STATEMENT OF THE CASE

On July 20, 2015, Plaintiff Sharen Smith, a resident of South Carolina, filed a complaint on behalf of herself and all similarly situated South Carolina residents concerning allegedly fraudulent insurance practices. Plaintiff asserted claims against the

---

[1] The Court sometimes uses "HealthExtras" as a short title to refer to these Defendants collectively because that was the trade name utilized in conjunction with the insurance policies in question at all times relevant to the Complaint.

architect of the alleged fraudulent insurance scheme (Catamaran, f/k/a Catalyst, f/k/a HealthExtras) and an underwriter (Stonebridge) which lent its name to the architect in order to facilitate solicitation of customers in South Carolina. Plaintiff invoked this Court's subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), alleging a class of more than 100 members and an aggregate amount in controversy in excess of $5,000,000.00.

Plaintiff alleged that the Defendants engaged in a pattern of wrongful conduct toward herself and others similarly situated in the State of South Carolina, including but not limited to the following: (a) the illegal selling and underwriting of blanket group insurance to consumers who were not members of any lawful, blanket group for which the sale of such an insurance product could be authorized; (b) the false and deceptive advertising, solicitation, sale, and post-sale marketing of disability insurance that is illegal under South Carolina law; (c) the creation of fictitious groups in which to place this insurance for the purpose of avoiding state insurance regulations and laws; (d) the calculation and collection of excessive premiums or fees charged for this illegal insurance product; (e) conspiracy among the defendants to create a sham organization operating under the name HealthExtras for the purpose of avoiding the State of South Carolina's insurance regulations and laws; (f) conspiracy among the defendants to create a sham organization operating under the name HealthExtras for the purpose of charging excessive illegal premiums for a virtually worthless disability insurance product; (g) conspiracy among the defendants to create a sham organization operating under the name HealthExtras for the purpose of concealing from the public and the State of South Carolina the true nature of the sham organization known as

HealthExtras; (h) unjust enrichment; (i) breach of contract; (j) breach of contract accompanied by a fraudulent act; (k) breach of the duty of good faith and fair dealing; (l) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code § 39-5-10, *et seq.*; and, (m) violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. (Compl., ECF No. 1 ¶¶ 19, 103-76.)

Litigation against HealthExtras, its successors, affiliated entities, and related underwriters regarding similar and/or substantially identical insurance policies to those at issue in the case *sub judice* is prolific. Plaintiffs' counsel have filed several related putative class actions in various jurisdictions, making similar and/or identical claims: *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 1:14-cv-00892-RC (D.D.C.); *Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 2:13-cv-06272-MCA-MAH (D.N.J.); *Gonzales v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 15-cv-02259 (S.D.N.Y.); *Graham v. Catamaran Health Solutions, et al.*, No. 4:14-cv-589 (E.D. Ark.), on appeal No. 16-1161 (8th Cir.); *Johnson v. Catamaran Health Solutions, LLC*, No. 15-cv-61752-RNS (S.D. Fla.), on appeal No. 16-11735 (11th Cir.); *Patel v. Catamaran Health Solutions, LLC*, No. 15-cv-61891-BB (S.D. Fla.), on appeal No. 16-10613 (11th Cir.); *Petruzzo v. HealthExtras, Inc., et al.*, No. 5:12-cv-00113 (E.D.N.C.), on appeal No. 15-1673; *Waiserman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2:14-cv-667 (C.D. Cal.), on appeal No. 14-56813 (9th Cir.); *Watson v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 2:14-cv-01312 (E.D. La.); *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 1:14-cv-00309-MHS (N.D. Ga.), on appeal No. 16-11302 (11th Cir.); *Williams v. Nat'l Union Fire Ins. Co. of*

*Pittsburgh, PA, et al.*, No. 6:14-cv-00870-BHH (D.S.C.). This Court also presides over the South Carolina *Williams* case, which is currently stayed pending finalization of the terms of the parties' settlement agreement. (*See* No. 6:14-cv-00870-BHH, ECF Nos. 131, 133.)

On September 21, 2015, Defendants filed the instant Motion to Dismiss (ECF No. 13), arguing that Plaintiff lacks standing to sue because she has not suffered an injury in fact and the case should therefore be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). Defendants further argue that even if Plaintiff has standing, she has not set forth factual allegations that, accepted as true, are sufficient to show she is entitled to relief and her claims should be dismissed under Rule 12(b)(6). Plaintiff filed a Response on October 8, 2015 (ECF No. 17), and Defendants filed a Reply on October 19, 2015 (ECF No. 18). Additionally, between December 2015 and February 2016 Defendants filed three Notices of Supplemental Authority (ECF Nos. 22, 23, 24), appraising the Court of relevant rulings in some of the related cases listed above. On May 5, 2016, Plaintiff filed a Notice of Settlement as to Defendant Catamaran (*i.e.* HealthExtras), but indicated that Plaintiff has not reached a settlement with the remaining Defendant, Stonebridge Life Insurance Company. The Court has thoroughly reviewed the parties' submissions and the relevant legal authority, and now issues the following ruling.

## **BACKGROUND**

The following facts are drawn from Plaintiff's Class Action Complaint ("Complaint"). This case involves allegations that Defendants engaged in the fraudulent advertising, marketing, and sale of "group" disability insurance ("the Policy") to South

Carolina residents who were not members of any group for which such an insurance product was authorized, and thus the policies were illegal. Plaintiff, Sharen Smith ("Plaintiff" or "Smith"), purchased one of the policies. Plaintiff claims that the policy she purchased was the same "HealthExtras Benefit Program" under the same alleged HealthExtras scheme as the plaintiffs in the *Williams* matter, No. 6:14-cv-00870-BHH, with the only difference being that the One Million Dollar ($1,000,000.00) lump sum Accident Permanent and Total Disability Benefit is underwritten by Defendant Stonebridge rather than National Union Fire Insurance of Pittsburgh, PA (one of the defendants in *Williams*). (ECF No. 1 ¶ 1.) Smith never made a claim against the Policy and is seeking to represent a class of purchasers in a similar position. (*See id.* ¶ 28 (class definition).) Indeed, the proposed class specifically excludes, *inter alia*, any policy holder for whom an actual identifiable claim for disability benefits has arisen that may be payable under the terms of the Policy. (*Id.*) Plaintiff further alleges that Defendants knew that the products they were selling were illegal and that the coverage promised by the policies was illusory because there was no intention to pay claims under that purported coverage. (*Id.* ¶¶ 82-83.)

**The Alleged Scheme**

Plaintiff claims that Defendants sent advertising materials to people through a partnership with major credit card companies and banks. (*Id.* ¶ 38.) Defendants' advertisements featured the late Superman actor, Christopher Reeve, who famously became a quadriplegic after falling from a horse, along with Mr. Reeve's statements endorsing the HealthExtras Benefit Program. (*Id.* ¶¶ 34, 38, 45, 81.)

The marketing flyers offered (1) a One Million Dollar ($1,000,000.00) Accidental

Permanent and Total Disability Benefit insurance product, and (2) an Out of Area Emergency Accident and Sickness Medical Expense Benefit that purported to cover up to Two Thousand Five Hundred ($2,500.00) in medical expense in the event of an accident or sickness while away from home ("HealthExtras Benefit Program") "for as little as Nine Dollars and Ninety-Five cents ($9.95) per month or Fifteen Dollars and Ninety cents ($15.90) per month depending on whether the individual added his or her spouse." (*Id.* ¶¶ 1, 38(d).) Plaintiff claims that, in reality, the insurance she was sold was effectively worthless because of a series of harsh and confusing exclusions that conflicted with what was represented in the marketing materials. (*Id.* ¶ 74.) The marketing materials contained statements such as,

> "This program provides valuable protection in the event you become permanently totally disabled due to an accident" and

> "You're covered with a $1,000,000 tax-free cash payment if you are permanently disabled as a result of an accident"

(*Id.* ¶ 73). However, Plaintiff avers that Catamaran and Stonebridge: (1) conspired to develop policy language and exclusions that would prevent policy holders from collecting on valid disability claims (*Id.* ¶¶ 75, 78); (2) that they had no intent to ever pay disability claims; and (3) that they had the specific intent to deny any disability claims made by victims of the HealthExtras scheme (*Id.* ¶¶ 76, 77).

Plaintiff further claims that only a small fraction of the premiums paid by members of the HealthExtras Benefit Program went to an insurance company to actually provide insurance coverage. (*Id.* ¶¶ 50, 70, 173.) The rest of the funds, Plaintiff avers, went to HealthExtras entities and its marketing partners rather than being used

for coverage or any purpose that would benefit Plaintiff or the putative class members.[2] (*Id.*)

Plaintiff alleges that Defendants facilitated the sale of these questionable insurance policies by fraudulently circumventing regulatory supervision and scrutiny established by South Carolina law that is intended to prevent such abuse. (*Id.* ¶¶ 41, 65.) According to Plaintiff, South Carolina law requires blanket group disability insurance to be marketed and sold to an employer or to a group that has been organized and is maintained in good faith for purposes other than that of obtaining insurance. (*Id.* ¶ 37.) The purpose of the rule is to allow the group, as the entity with the insurable interest in its members, to scrutinize the terms of coverage and price of coverage to ensure its members are receiving a good insurance product for a fair price. (*Id.*) Plaintiff avers that in order to get around this limitation, Defendants designated their policy holders as "members" of a fictitious "group" and deposited their premiums into an account held under the name of the fictitious group or a bogus "trust," before distributing them to Defendants for their profit. (*Id.* ¶¶ 37, 38, 57.) As the complaint alleges:

> Despite statutory requirements and specific knowledge that a group of credit card holders were not a valid group for purposes of blanket or group accident polices, in an extraordinary display of self-dealing, Defendants Stonebridge, Catamaran, and others created a fictitious group and issued the policies to HealthExtras, Inc. as the "Policyholder." HealthExtras, Inc. was not an employer, or any other organization as defined under S.C. Code Ann. § 38-71-730. HealthExtras Inc. was not a group or association at all. HealthExtras, now Catamaran, was a fictitious, illegal and sham company, with premiums collected for the benefit of it and its business partners, rather than a valid group of persons. There was no constitution or bylaws and the HealthExtras "members" had no voting privileges or

---

[2] The Court would note that Plaintiff has not pled this theory with any specific facts, but only "upon information and belief." Unlike the plaintiff's complaint in *Williams*, the Complaint here does not include dollar amounts or percentages detailing the portion of premiums that went to HealthExtras, which is not a licensed insurer, and what portion went to Stonebridge, the purported underwriter of the risk in the disability policy. (*Compare* ECF No. 1 ¶¶ 50, 70, 173; *with* No. 6:14-cv-00870-BHH, ECF No. 1 ¶ 90.)

representation on any boards or committees. This group was created for the sole purpose of selling the HealthExtras Scheme to consumers, while avoiding supervision and oversight of the South Carolina Department of Insurance in direct violation of South Carolina law.

(*Id.* ¶ 61.) Furthermore, because the insurance was a "group policy," the "group" formed by Defendants was the actual holder of the policy and those who purchased coverage were not given a copy of the master policy, but rather a Certificate of Insurance that summarized the coverage terms and explained the individual's rights under the master policy. (*Id.* ¶ 52.)

Plaintiff asserts that the insurer(s) who were contracted to underwrite the benefits either misrepresented to the state insurance regulators that the Policy was intended to be issued to a valid group under state law or intentionally failed to apply for approval. (*Id.* ¶ 38(h)-(i).) Consequently, the Catamaran Defendants reaped massive profits with their revenues increasing from $5.3 million in 1999 to $44.2 million in 2000. (*Id.* ¶ 40.) In addition, avers Plaintiff, the HealthExtras scheme resulted in a huge windfall for HealthExtras, Inc. and CEO David Blair; specifically, after HealthExtras Inc. and its successor corporation Catalyst Health Solutions were sold for $4.4 billion to SXC Health Solutions in July 2012, creating the company now known as Catamaran Health Solutions, LLC, Mr. Blair received a $16 million compensation package in 2012, which followed his earnings of $9.4 million in 2011. (*Id.* ¶ 42.) Plaintiff alleges that Stonebridge essentially sold its name and insurance license to the Catamaran Defendants (none of which were licensed to conduct the business of insurance in South Carolina) for use in the scheme, with specific knowledge that the insurance program was illegal. (*Id.* ¶¶ 86-96.) As noted, the policies were marketed through a partnership between the Catamaran Defendants and major credit card companies and banks, and the payments

8

for the policies were automatically deducted from the card or account holder's account on a monthly or yearly basis. (*Id.* ¶ 38.)

**STANDARD OF REVIEW**

**Subject Matter Jurisdiction**

Article III of the U.S. Constitution limits the jurisdiction of federal courts to deciding only actual "cases" and "controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). One benchmark that sets apart those "cases" and "controversies" that are of the justiciable sort is the doctrine of standing, which has been held to be an "essential and unchanging part of the case-or-controversy requirement." *Id.* at 560. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 56-61); *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002)). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560; *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013). The party invoking federal jurisdiction has the burden of establishing all three elements of standing. *Lujan*, 504 U.S. at 561; *Cooksey*, 721 F.3d at 234.

A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction, and the plaintiff bears the burden of showing that

federal jurisdiction is appropriate when challenged by the defendant. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) ("[The plaintiff] must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing."); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A motion to dismiss for lack of subject matter jurisdiction may either (1) assert that the complaint fails to allege facts upon which subject matter jurisdiction can be based, or (2) contest the jurisdictional allegations of the complaint themselves. *Adams*, 697 F.2d at 1219. In the first scenario, which is the challenge in the case *sub judice*, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id.* Thus, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

## Failure To State A Claim Upon Which Relief Can Be Granted

A plaintiff's complaint should set forth "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556)). In considering a motion to dismiss under Fed. R.

Civ. P. 12(b)(6), a court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). A court should grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

As previously noted, to survive a Rule 12(b)(6) motion to dismiss a complaint must state "a *plausible* claim for relief." *Iqbal*, 556 U.S. at 679 (emphasis added). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Still, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010).

11

## DISCUSSION

Defendants contend that Plaintiff has not shown in her pleading that she suffered a cognizable injury and that she therefore lacks standing. Specifically, Defendants argue that even when you accept all of Plaintiffs factual allegations as true, she has not suffered an injury in fact, because she has not alleged an invasion of a legally protected interest which is both "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *See Lujan*, 504 U.S. at 560. For the reasons stated below, the Court agrees, and grants Defendants' Motion to Dismiss under Rule 12(b)(1) for lack of standing without needing to reach questions pertaining to whether Plaintiff stated a plausible claim for relief for each cause of action under Rule 12(b)(6).

Throughout her Complaint, Plaintiff alleges that the insurance coverage she received as a member of the HealthExtras Benefits Program was "illegal" and "void." (ECF No. 1, *passim.*) The bases for this allegation are Plaintiff's asserted facts, which the Court assumes to be true, that the Policy was not issued to a valid blanket group (*see* ECF No. 1 ¶¶ 57, 60-65, 84), and that Defendants failed to obtain approval for the coverage from the South Carolina Department of Insurance in violation of applicable state statutes (*see id.* ¶¶ 58-59, 90). The question is whether Plaintiff can be said to have suffered any injury in the absence of any assertion(s): (1) that claims against the Policy were improperly denied; (2) that knowledge of allegedly "harsh and confusing exclusions" in the Policy caused any member to forego submitting a claim in the first instance; or (3) that the Policy failed to meet the minimum standards of "total disability" required by South Carolina insurance regulations.

Defendants' main argument for dismissal is that even if Plaintiff could

12

demonstrate that the Policy fails to comply with the South Carolina Insurance Code in the manner alleged in the Complaint, the Policy remains enforceable as a matter of law. (ECF No. 13-1 at 5.) Thus, the argument goes, Plaintiff got precisely what she paid for—enforceable disability insurance coverage—and has not suffered an actual, concrete, particularized injury in fact. (*Id.* (citing *Lujan*, 504 U.S. at 560).)

South Carolina Code § 38-71-80, entitled "Construction of policy issued in violation of chapter," states:

> A policy issued in violation of this chapter is held valid but must be construed as provided in this chapter, and, when any provision in the policy is in conflict with any provision of this chapter, the rights, duties, and obligations of the insurer, the policyholder, and the beneficiary are governed by the provisions of this chapter.

S.C. Code § 38-71-80. To the Court's knowledge, section 38-71-80 has not been construed by any South Carolina court, but its plain language establishes that an accident or health insurance policy such as the one at issue in this case is held "valid" and enforceable even where it does not comply with the requirements of Chapter 71 of South Carolina's Insurance Code (Title 38).

As indicated above, Plaintiff's claims all flow from a core theory that the permanent and total disability insurance coverage issued by Stonebridge did not comply with certain provisions of Chapter 71 of the Code. Specifically, Plaintiff alleges that Defendants violated section 38-71-720 (*see* ECF No. 1 ¶¶ 55, 58-59), which provides in pertinent part:

> (A) A policy or contract of group accident, group health, or group accident and health insurance may not be issued or delivered in this State, nor may any application, endorsement, or rider which becomes a part of the policy be used, until a copy of the form has been filed with and approved by the director or his designee except as exempted by the director or his designee as permitted by Section 38-61-20.

13

S.C. Code § 38-71-720. Additionally, Plaintiff alleges that Defendants violated section 38-71-730 (*see* ECF No. 1 ¶¶ 56-57, 60-62, 64-66), which provides in pertinent part:

> No policy of group health, group accident, or group accident and health insurance may be delivered or issued for delivery in this State unless it conforms to the following description:
>
> > (1) Except as provided in this item, the policy is issued to a trust or to insure two or more persons who are associated in a common group for purposes other than obtaining insurance.

S.C. Code § 38-71-730. Stated simply, Plaintiff's entire case rests on the theory that Defendants deliberately created an invalid "group" to which to issue the Policy so that consumers' interests would not be protected in the way the regulatory framework envisions, and calculatingly misrepresented the nature of the group to state insurance regulators or failed to apply for approval altogether in an intentional effort to avoid scrutiny. (*See* ECF No. 1 ¶¶ 38-39, 41, 43, 52-72.)

As loathsome as this alleged course of conduct is, the Court is not permitted to put a thumb on the scale of justice and manufacture standing for the Plaintiff out of a misguided attempt to right what feels like a social wrong. Even viewing the allegations in the light most favorable to Plaintiff, the face of her pleading reveals no injury, and the way she has defined her putative class ensures that no policy holder with an actual injury in fact would be part thereof. Plaintiff has specifically excluded from the proposed class any policy holders with "[a]ctual identifiable claims for disability benefits that have already arisen that may be payable under the terms of said disability insurance policies." (*Id.* ¶ 28(e).) Plaintiff has not alleged that *but for* unduly restrictive terms and conditions in the Policy she *would have* tendered a claim for benefits, neither has she included this concept more broadly as a theory of the case. Finally, Plaintiff has not

14

asserted that the Policy was "illegal" for any other reason than that it was "virtually worthless" and "void under South Carolina law" for failure to comply with the state statutory provisions detailed above. But section 38-71-80 says otherwise; indeed, it mandates that insurance policies that would otherwise be voidable for lack of compliance with Chapter 71 are to be held valid and construed in conformity with the Chapter, thus vindicating the rights of the policyholder and beneficiary and enforcing the duties and obligations of the insurer. *See* S.C. Code § 38-71-80.

One important distinction between Plaintiff's pleading and the complaint in *Williams*, is that here Plaintiff does not allege that her coverage violated South Carolina Insurance Regulation 69-34(E)(9), which states that "total disability" may not be defined within a policy more narrowly than the definition set forth in the Regulation. (*Compare* ECF No. 1; *with* No. 6:14-cv-00870-BHH, ECF No. 1 ¶¶ 79-82.) Actually, Plaintiff provides *no policy definitions* and *no detail* as to how its "harsh exclusions" allegedly "make recovery under the [P]olicy virtually impossible" and render the Policy "virtually worthless to purchasers."[3] (*See* ECF No. 1 ¶¶ 68, 74.) In this context, Plaintiff's assertions that Defendants had "no intent to ever pay disability claims" and instead had a "specific intent to deny any disability claims made by victims of the HealthExtras Scheme" (*see id.* ¶¶ 76-77, 83-84, 88, 91, 101, 135, 139) are entirely speculative. Likewise, Plaintiff's unsupported allusion to "many examples in the public record of victims of the HealthExtras Scheme being denied disability benefits after suffering catastrophic injuries" because of unspecified "harsh and confusing exclusions" (*see id.*

---

[3] Specifically, Plaintiff does not plead the same hyper-restrictive set of qualifying injuries and definitions that were present in the *Williams* case. (*See* No. 6:14-cv-00870-BHH, ECF No. 113 at 3-4.) Given these *notable* differences in the pleadings, the Court is left wondering whether the policies at issue in the two cases are actually the same, as Plaintiff boldly asserts. (*See* ECF No. 1 ¶ 1.) But the resolution of this discrepancy is not material to the resolution of the instant Motion to Dismiss.

¶¶ 51, 78), while sounding horrific, in the absence of any well-pled connection to *this* Policy, *this* Plaintiff, and *this* underwriter, does nothing to support Plaintiff's bald assertions about Defendants' intent to deny claims. Plaintiff merely suggests that because other unnamed individuals allegedly had their claims denied in bad faith, hers would have been denied as well, *if she had made one*. "Such conjecture cannot replace the type of factual allegations necessary to transform a speculative chain of possibilities into a plausible allegation of concrete, actual injury in fact." *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 130 F. Supp. 3d 236, 250 (D.D.C. 2015) (citing *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1148 (2013) (finding no actual or imminent injury in fact where the plaintiffs' "theory of standing . . . relies on a highly attenuated chain of possibilities," and they "merely speculate and make assumptions about whether their communications with their foreign contacts will be acquired")); *see Doe v. Blue Cross Blue Shield of Md., Inc.*, 173 F. Supp. 2d 398 (D. Md. 2001) (holding that ERISA plaintiffs' claim that insurer would deny future claims based on a restrictive reading of the parties' contract did not constitute injury to support a breach of contract claim, because contract law "does not recognize a cause of action based on the theory that the market value of the contract itself has been diminished because one side may breach it in the future"); *Weaver v. Aetna Life Ins. Co.*, No. 3:08-CV-00037, 2008 WL 4833035, at *3 (D. Nev. Nov. 4, 2008) (dismissing unjust enrichment claim for lack of standing where the plaintiff alleged that she "paid premiums for a nonexistent policy," because "one could not deem a policy nonexistent unless she were improperly denied benefits" and "[a]ny other claim of a 'nonexistent' policy ventures into the metaphysical, as one cannot know whether a policy exists until availing oneself of its benefits"), *aff'd*,

370 F. App'x 822 (9th Cir. 2010); *Impress Commc'ns v. Unumprovident Corp.,* 335 F.Supp.2d 1053, 1059-61 (C.D. Cal. 2003) (holding that ERISA plaintiffs failed to establish injury in fact to support a breach of contract claim for restitution and disgorgement based on alleged diminution in value of the policy where their "allegation that [the defendants'] administration of the plan might result in denial of future benefits is purely speculative and does not suffice to constitute a breach of contract," because until the defendants failed to honor a valid claim "there can be no breach of contract").

Having established that Plaintiff's policy would have been held valid and construed in accordance with Chapter 71 of South Carolina's Insurance Code in the event she *had* submitted a claim, the only remaining potential source of harm is that she paid *too much* for the coverage that she received. However, as the Court noted in *Williams* (*see* ECF No. 113 at 11), the fact that a party pays more for something than it is worth does not in itself give rise to a cause of action. *See e.g.*, *Ryan v. Weiner*, 610 A.2d 1377, 1381 (Del. Ch. 1992) ("It is [the] general rule, recited by courts for well over a century, that the adequacy or fairness of the consideration that adduces a promise or a transfer is not alone grounds for a court to refuse to enforce a promise or to give effect to a transfer."); *F.D.I.C. v. Hartford Acc. & Indem. Co.*, 97 F.3d 1148, 1151 (8th Cir. 1996) ("A court must not impose its own concept of fairness under the guise of construing a contract."); *see also Atkinson v. Belser*, 255 S.E.2d 852, 855 (S.C. 1979) ("Inadequate consideration is not a ground for rescission of a deed unless it is 'so palpably disproportioned to the real and market value of the property as to constitute an unconscionable contract.'" (quoting *Holly Hill Lumber Co., Inc. v. McCoy*, 23 S.E.2d 372, 380 (S.C. 1942))); *Jackson v. Carter*, 121 S.E. 559, 563 (S.C. 1924) ("It is not the

business of courts to protect parties from the consequences of bad contracts, but to protect them from the consequences of either legal or moral fraud and imposition." (internal quotation and citation omitted)).

The Court is fully aware that in *Williams* it denied the defendants' motion to dismiss, reasoning that even if the insurance policies there were enforceable, they were still essentially worthless because they were, by their terms, so restrictive that virtually no one would ever suffer a covered injury. (*See* No. 6:14-cv-00870-BHH, ECF No. 113 at 11.) Thus, the Court at that time could at least conceive of some harm to plaintiff *Williams* and the putative class. Specifically, harm in the form of a type of transaction cost that they should not have to bear as paying policy members who would, plausibly, have to fight legal tooth-and-nail to recover for disabilities that otherwise clearly qualified for coverage under the definitions provided in the South Carolina Insurance Regulations, potentially even discouraging members with real disabilities from making a claim at all. It was a stretch, but the Court believed that plaintiff *Williams* made enough of a showing to establish standing and move that case beyond the motion to dismiss stage. (*See id.* at 12 ("[T]his Court is uncomfortable concluding as a matter of law that the plaintiff suffered no harm at this stage.").) Here, however, the Court has no factual basis upon which to conclude that the Policy is so restrictive because Plaintiff's complaint is utterly devoid of detail regarding the terms of the Policy and does not include any allegation that the Policy attempts to circumvent the regulatory definition of "total disability." The Court will not speculate about the Policy terms and declines to engage in Plaintiff's proposed conjecture about Defendants' prospective intent to deny as yet unmaterialized claims. Unlike in *Williams*, the Court is comfortable concluding

that the face of Plaintiff's pleading reveals no harm that is actual and imminent, as opposed to conjectural and hypothetical, and that she therefore lacks standing. *See Friends of the Earth*, 528 U.S. at 180-81.

Other courts confronting the same standing issue with respect to substantially identical pleading schemes have reach analogous conclusions. In *Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 2:13-cv-06272-MCA-MAH (D.N.J.), the district court held that the plaintiffs lacked standing because the policies were enforceable under New Jersey law and "any suggestion that [the defendants] would not honor [the plaintiffs'] claims is mere speculation, and not a concrete harm." 2015 WL 7871165, at *5 (D.N.J. Dec. 4, 2015) (citing *Maio v. Aetna Inc.*, No. 99-1969, 1999 WL 800315, at *2 (E.D. Pa. Sept. 29, 1999) *aff'd*, 221 F.3d 472 (3d Cir. 2000) ("The HMOs simply cannot be 'worth less' unless something plaintiffs were promised was denied them.")).[4] In

---

[4] In *Maio*, the Third Circuit affirmed the trial court's dismissal of the insured parties' RICO claims for lack of standing, stating:

> For the reasons that follow, we reject appellants' theory that their complaint states valid RICO claims based on the financial losses they purportedly sustained by enrolling in Aetna's "inferior" HMO plan in the absence of allegations to the effect that each appellant suffered negative medical consequences resulting from Aetna's enactment of the policies and practices at issue. Stated another way, in the context of this case, *we hold that appellants cannot establish that they suffered a tangible economic harm compensable under RICO unless they allege that health care they received under Aetna's plan actually was compromised or diminished as a result of Aetna's management decisions challenged in the complaint.* It seems clear to us that unless appellants claim that Aetna failed to provide sufficient health insurance coverage to the members of their HMO plan in the sense that such individuals were denied medically necessary benefits, received inadequate, inferior or delayed medical treatment, or even worse, suffered personal injuries as a result of Aetna's systemic policies and practices, *there is no factual basis for appellants' conclusory allegation that they have been injured in their "property" because the health insurance they actually received was inferior and therefore "worth less" than what they paid for it.* Of course, such losses would have to be alleged and proven on an individual basis. Inasmuch as we hold that appellants have not alleged facts sufficient to establish the fact of damage, i.e., appellants' injury to property stemming from their purchase of an "inferior" product, they have no cause of action under RICO.

*Maio*, 221 F.3d at 487-88 (emphasis added). The analogy to this case is clear. Plaintiff has no standing to claim that the coverage she received was worth less than what she paid for it in the absence of any showing that she was denied something that she was promised.

*Petruzzo v. HealthExtras, Inc., et al.*, No. 5:12-cv-00113 (E.D.N.C.), the district court reversed its previous order denying various motions to dismiss and held that because North Carolina law required the insurance policies to be held valid, irrespective of whether they had been issued to an improper "group" and whether the underwriter intentionally failed to submit the appropriate documentation to the insurance commissioner for approval, the plaintiffs suffered no injury in fact and lacked standing to pursue any of their claims. 124 F. Supp. 3d 642, 651-52, 655-56 (E.D.N.C. 2015).[5]

Moreover, in *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 1:14-cv-00892-RC (D.D.C.), the district court found that the plaintiff lacked standing because the D.C. Code section the defendants were alleged to have violated contained language dictating that non-conforming insurance policies "shall be held valid but shall be construed as provided in this section;"[6] therefore, "to the extent that [the plaintiff] asserts injury premised on payments for a policy that was invalid and unenforceable due to violations of DC insurance laws, the argument clearly fails as a matter of law."[7] 130 F. Supp. 3d 236, 250 (D.D.C. 2015). In *Waiserman v. Nat'l Union Fire Ins. Co. of*

---

[5] The insurance statutes at issue in *Petruzzo* are perhaps the closest analogue to the statutes at issue in the case *sub judice*. As here, N.C. Gen. Stat. § 58-51-75(a)(5) requires that "blanket accident and health insurance policies" be issued only to a sufficiently large group of persons "formed for purposes other than obtaining insurance." As here, N.C. Gen. Stat. § 58-51-95 requires that such policies may not be issued or delivered to persons within the state without first having been approved by the insurance commissioner. And just like here, N.C. Gen. Stat. § 58-50-15(b) provides in relevant part that "[a] policy delivered or issued for delivery to any person in [North Carolina] in violation of Articles 50 through 55 of [Chapter 58, the Insurance Code] shall be held valid but shall be construed as provided in Articles 50 through 55 of this Chapter." It was in this context that the *Petruzzo* court held that the "plaintiffs lack Article III standing to prosecute their claims . . . . [The plaintiffs] have suffered neither a concrete nor an imminent injury. The insurance program, consisting of both the Disability Benefit and Health Benefit, is valid and enforceable under North Carolina law." 124 F. Supp. 3d 642, 655.

[6] D.C. Code § 31-4712(d)(2).

[7] The *Campbell* court found that the plaintiff in that suit did have standing to assert certain claims on grounds that she was charged premiums in excess of her contractual obligation (an allegation Plaintiff does not make in this case) and on grounds that the defendants violated her statutory right to truthful information about consumer goods and services under D.C. Code § 28-3901(c) (also not at issue in this case). 130 F. Supp. 3d 236, 252. The defendants in *Campbell* did not challenge the adequacy of either of those alleged injuries for lack of standing. *Id.*

*Pittsburgh, PA*, 2:14-cv-667 (C.D. Cal.), the district court rejected the plaintiff's claims that he had standing due to his purchase of an invalid and illusory insurance policy because California law deemed such policies valid and enforceable even if the defendants were not licensed to sell insurance and "created a sham trust to mask their dealings;" the court dismissed all claims with prejudice for lack of an injury in fact. *Waiserman*, No. 2:14-CV-667-SVW-CW, ECF No. 84 at 3-6 (C.D. Cal. Oct. 24, 2014). In *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 1:14-cv-00309-MHS (N.D. Ga.), the Northern District of Georgia initially denied the defendants' motion to dismiss despite finding that the insurance policies were valid and enforceable, because it concluded that the plaintiffs' lack of injury in fact "[could not] be determined as a matter of law from the face of the pleadings." 2014 WL 4386463, at *3 (N.D. Ga. Sept. 4, 2014). However, the court later granted summary judgment in the defendants' favor, finding that the plaintiffs lacked standing because they "[could not] demonstrate a cognizable injury based on the theory that the insurance policies were illegal or void" and "[could not] establish a concrete injury based on the theory that the [d]efendants never intended to pay out claims." 2016 WL 739537, at *2 (N.D. Ga. Feb. 24, 2016).

Plaintiff responds to the standing challenge by first arguing that she has pled an invasion into her statutorily created rights, and, therefore, has pled an injury in fact sufficient for Article III standing. (*See* ECF No. 17 at 4.) She cites the U.S. Supreme Court in *Warth v. Seldin*, 422 U.S. 490 (1975), for the premise that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Id.* at 500. Plaintiff further argues that courts have held that mere allegations of an actual, individualized invasion of statutory

rights satisfies the injury in fact requirement, regardless of the existence of economic damages. (ECF No. 17 at 5 (citing *Havens Realty Corp v. Coleman*, 455 U.S. 363, 373-374 (1982); *Hammer v. Sam's East, Inc.*, 754 F.3d 492, 498-99 (8th Cir. 2014); *E.M. v. New York City Dept. of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014); *Alston v. Countrywide Financial Corp.*, 585 F.3d 753, 762-63 (3rd Cir. 2009); *In re Carter*, 553 F.3d 979, 989 (6th Cir. 2009); *United Transp. Union Local Unions 385 and 77 v. Metro-North Commuter Railroad Company*, No. 94-CV-2979, 1995 WL 634906, *3 (S.D.N.Y. Oct. 30, 1995)).)

But Plaintiffs' arguments in this regard have a glaring fault: there is no authority to establish that the "statutory rights" which she claims Defendants violated are hers to vindicate. The insurance statutes in which Plaintiff finds these purported rights are S.C. Code §§ 38-71-10, 38-71-720, 38-71-730. (ECF No. 17 at 7.) Additionally, Plaintiff claims that her right not to be the subject of unfair or deceptive trade practices under S.C. Code § 39-5-10 ("SCUTPA") has been infringed. (*Id.*) Putting aside the fact that SCUTPA expressly exempts from its own scope unfair trade practices pertaining to the business of insurance, *see* S.C. Code § 39-5-40(c),[8] and further putting aside the fact that SCUTPA expressly prohibits class actions, *see* S.C. Code § 39-5-140,[9] it cannot be disputed that the substance of Plaintiff's SCUTPA claim is *based entirely* on her theory that Defendants violated the itemized insurance statutes when they set up an unlawful group and collected premiums on a policy that had not been approved (*see* ECF No. 1

---

[8] Such unfair practices are instead regulated under the Insurance Trade Practices Act, S.C. Code § 38-57-10, *et seq.*

[9] Moreover, the South Carolina Supreme Court recently affirmed the trial court's *dismissal* of a putative SCUTPA claim because it was brought as part of a class action lawsuit. *See Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 678 S.E.2d 430, 434, (S.C. 2009) ("[B]ecause SCUTPA claims may not be maintained in a class action law suit, the trial court properly dismissed Appellants' claim.").

¶¶ 104-110). Thus, the only source of the "statutory rights" that Plaintiff claims were infringed, establishing standing even in the absence of economic damages, are S.C. Code §§ 38-71-10, 38-71-720, 38-71-730. The Court is unconvinced by Plaintiff's arguments.

The insurance statutes that Plaintiff cites as the source of her "rights" are all part of Chapter 71 (Accident and Health Insurance) of the South Carolina Insurance Code (Title 38), which does not expressly confer a private right of action. Neither does anything in the text of sections 38-71-10, 38-71-720, or 38-71-730 (which, *inter alia*, entitle licensed accident and health insurers to issue and deliver insurance contracts, require new policies to be approved by the Department of Insurance, and require group accident policies to be issued only to groups associated for purposes other than obtaining insurance), suggest to the Court that a private right of action is implied therein. "Essentially, the standing question in [cases where an infringement of rights is alleged] is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500. The Court does not believe that the insurance statutes at issue here are properly understood in this way, and, in the absence of economic damages, it appears that Plaintiff has no "statutory rights" that she can properly vindicate.

None of the cases that Plaintiff cites remedy this flaw in her argument. In almost all of the cases Plaintiff cites to support the principle that merely alleging infringement of a statutory right, without accompanying economic damages, is enough to establish standing, the underlying statute expressly conferred a private right of action. *See Havens Realty Corp v. Coleman*, 455 U.S. 363 (1982) (claims brought under the Fair

Housing Act, which confers a private right of action); *Hammer v. Sam's East, Inc.*, 754 F.3d 492 (8th Cir. 2014) (claims brought under the Fair and Accurate Credit Transactions Act, which confers a private right of action); *Alston v. Countrywide Financial Corp.*, 585 F.3d 753 (3rd Cir. 2009) (claims brought under the Real Estate Settlement Procedures Act, which confers a private right of action); *In re Carter*, 553 F.3d 979 (6th Cir. 2009) (same). Two of the cases cited by Plaintiff found that the underlying statute was fairly understood as granting persons in the plaintiffs' position a right to judicial relief. *See E.M. v. New York City Dept. of Educ.*, 758 F.3d 442, 451 (2d Cir. 2014) (noting that the Individuals with Disabilities Education Act under which the claims were brought invited judicial review and created education mandates enforceable by individual claimants through the federal courts); *United Transp. Union Local Unions 385 and 77 v. Metro-North Commuter Railroad Company*, No. 94-CV-2979, 1995 WL 634906, *2-3 (S.D.N.Y. Oct. 30, 1995) (finding that section 60 of the Federal Employers' Labor Act was fairly understood as conferring on union members a right to voluntarily furnish information relevant to work-related accidents and injuries, which gave them individual standing to sue to vindicate that right, and by derivation, gave the Union standing to sue on their collective behalf). The remaining cases cited by Plaintiff are inapposite for various reasons. *See Long Term Care Partners, LLC v. U.S.*, 516 F.3d 225, 231-238 (4th Cir. 2008) (declining to decide the standing issue and instead finding judicial review improper due to the absence of "final agency action" under the Administrative Procedure Act); *Sun Life Assur. Co. of Canada v. Moran*, No. CV-08-0629-PHX-GMS, 2009 WL 2450443, at *5 (D. Ariz. Aug. 11, 2009) (finding that plaintiff life insurance company suffered an injury in fact sufficient to confer standing under a

state statute prohibiting "wager policies" even in the absence of any claim because the policies in question were issued to and/or under the direction of a party possessing no insurable interest); *U.S. ex rel. Yankton Sioux Tribe v. Gambler's Supply, Inc.*, 925 F. Supp. 658, 660 (D.S.D. 1996) (stating in plaintiffs *qui tam* action to recover monies paid under contracts relating to the management of a Native American casino because they were never approved by the Secretary of the Interior, "[s]tanding has not been argued in this case because, *in addition to the standing granted by statute*, [the plaintiffs] in both cases have personal stakes in a suit brought to recoup monies paid by a tribe under void contracts" and both "enrolled member[s] of the [Tribe], and the Tribe itself, share a legally enforceable right to a portion of the profits from the use of the Tribe's land" (emphasis added)). Accordingly, Plaintiff's arguments for standing in the absence of any ascertainable damages are unavailing.

Of course, none of this is to say that insurance companies and their business partners can simply violate South Carolina insurance laws with impunity. Rather, the insurance code specifically vests the Director of the Department of Insurance, or his designee, with the duty to "see that all laws of this State governing insurers or relating to the business of insurance are faithfully executed and make regulations to carry out this title and all other insurance laws of this State, the enforcement or administration of which is not otherwise specifically provided for." S.C. Code § 38-3-110(2). Moreover, the Director also has express duties to "report to the Attorney General or other appropriate law enforcement officials criminal violations of the laws relative to the business of insurance or the provisions of this title which he considers necessary to report" and to "institute civil actions, either through his office or through the Attorney

General, relative to the business of insurance or the provisions of this title which he considers necessary to institute." S.C. Code §§ 38-3-110(3) and (4); *see also* S.C. Code § 38-2-10 (detailing administrative penalties that may be imposed for violation of state insurance laws); §§ 38-13-10 through 38-13-30 (detailing the powers of the Director to make examination of insurers, persons, and businesses, considering their compliance with relevant South Carolina laws and regulations, to determine when regulatory action is appropriate, and to initiate proceedings or actions provided by law accordingly).

In summary, all of Plaintiff's causes of action are contingent on three alleged sources of injury: (1) that the Policy was "illegal" and void under South Carolina law, (2) that the Policy was "virtually worthless" because of "harsh and confusing exclusions" and because Defendants had no intent to pay claims, and (3) that the Policy was sold through an illegal scheme, where most of the premiums collected enriched HealthExtras and represented no benefit to the policy members at all. (*See* ECF No. 1 ¶¶ 84.) As thoroughly detailed above, these allegations are either wrong as a matter of law (given the application of S.C. Code § 38-71-80) or entirely speculative, and the face of Plaintiff's Complaint reveals no concrete, actual or imminent harm. Because Plaintiff's lack of standing applies to all of her theories of liability, the Court sees no need to conduct an independent analysis of each cause of action for failure to state a claim under Rule 12(b)(6). To do so would be extraneous effort. Accordingly, the Motion to Dismiss is granted and this matter is dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 13) is GRANTED and the Clerk of Court is directed to close this action accordingly.

**IT IS SO ORDERED.**

<u>/s/ Bruce Howe Hendricks</u>
United States District Judge

September 1, 2016
Greenville, South Carolina